Eurus Kelly WATERS, Petitioner–
Appellant,

v.

Albert G. THOMAS, Warden Georgia
Diagnostic and Classification Center,
Respondent–Appellee.

No. 88–8935.

United States Court of Appeals,
Eleventh Circuit.

Feb. 27, 1995.

Rehearing Denied April 4, 1995.

James M. Doyle, Deputy Chief Counsel, Public Counsel Div., The Com. of Massachusetts, Committee for Public Counsel Services, Boston, MA, Wade W. Herring, II, Savannah, GA, for appellant.

Paula Smith, Asst. Atty. Gen., Atlanta, GA, for appellee.

Before TJOFLAT, Chief Judge, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK and CARNES, Circuit Judges,* and CLARK**, Senior Circuit Judge.

ANDERSON and CARNES, Circuit Judges: [1]

Eurus Kelly Waters kidnapped Anita Paseur, age sixteen, and Kathryn Culpepper, age thirty-five, who had been fishing on Jekyll Island, Georgia. At gunpoint, he forced the women to march into the woods, where he handcuffed them together. Waters orally sodomized Ms. Culpepper. Then he shot her. After shooting the older woman, Waters shot her young friend. At some point, he tore the teenager's clothes off, leaving her nude from the waist down. As he was leaving the scene, Waters stopped by Ms. Culpepper's automobile to steal her pocketbook, which contained seven dollars. Anita Paseur died at the scene. Kathryn Culpepper died five days later. Other details of the crime and the overwhelming evidence of Waters' guilt are set out in the opinion of the Georgia Supreme Court, *Waters v. State*, 248 Ga. 355, 283 S.E.2d 238 (1981), *cert. denied*, 463 U.S. 1213, 103 S.Ct. 3551, 77 L.Ed.2d 1398 (1983), which affirmed Waters' convictions and death sentences for both murders. 283 S.E.2d at 249, 252.

Waters filed a petition for habeas corpus relief in state court, which was denied after an evidentiary hearing. Following the Georgia Supreme Court's denial of Waters' application for certificate of probable cause to appeal, certiorari was denied, *Waters v. Kemp*, 475 U.S. 1039, 106 S.Ct. 1249, 89 L.Ed.2d 357 (1986). Waters then filed a federal habeas corpus petition, 28 U.S.C. § 2254, which the district court denied in an extensive order.

A panel of this Court affirmed the denial of habeas corpus relief insofar as the convictions were concerned, *Waters v. Zant*, 979 F.2d 1473, 1490–92 (11th Cir.1992), but reversed the denial of relief as to the death sentences, holding that Waters had received ineffective assistance of counsel at the sentence stage of the proceedings, *id.* at 1492–98. The panel was unanimous in affirming the denial of guilt stage relief, but Chief Judge Tjoflat dissented from the panel majority's holding that Waters was due sentence stage relief on ineffective assistance

---

* Judge Barkett became a member of the Court after February 18, 1994, when this case was argued and taken under submission. She has elected not to participate in this decision.

** Senior U.S. Circuit Judge Thomas A. Clark elected to participate in this decision, pursuant to 28 U.S.C. § 46(c).

1. This opinion was written jointly by Judges Anderson and Carnes. *Cf. Peek v. Kemp*, 784 F.2d 1479 (11th Cir.) (en banc) (authored by Vance and Anderson, JJ.), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986). Parts I, II, and III of this opinion were authored by Judge Carnes; Part IV was authored by Judge Anderson.

grounds, *id.* at 1498–1504 (Tjoflat, C.J., concurring in part and dissenting in part). We granted the State of Georgia's suggestion for rehearing en banc, vacating the panel opinion. *Waters v. Zant,* 11 F.3d 139 (11th Cir. 1993).

## I. DENIAL OF GUILT STAGE RELIEF

■ We affirm the denial of guilt stage relief for the reasons set out in the panel opinion, 979 F.2d at 1490–92, 1498 n. 69, subject to one qualification. We agree with the panel's holding that Waters' guilt stage ineffective assistance of counsel claims are due to be denied because the evidence of guilt was so overwhelming that Waters cannot show prejudice from any of the claimed shortcomings of his counsel at the guilt stage. *Id.* at 1490. However, just two sentences before stating, "we decline to express an opinion on whether the performance of Davis and Manning as to the guilt-innocence phase actually did fall below an objective standard of reasonableness," *id.* at 1491, the panel nonetheless expressed an opinion that the guilt stage ineffective assistance claims "are not without merit," *id.* at 1490. A court may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied, *Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), and that is apparently what the panel intended to do. Its reference to the claims as "not without merit" may have been inadvertent. In any event, we adopt the holding that relief was properly denied as to the guilt stage ineffective assistance of counsel claims because Waters failed to establish the prejudice component, but we do not reach the question of whether those claims otherwise would have had merit.

## II. DENIAL OF RELIEF ON THE SENTENCE STAGE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Waters was represented at trial by two attorneys, John Davis and Don Manning, Jr., both of whom were associated with the county public defender's office. The district court found that both were experienced attorneys. Davis had more than eight years experience in private practice; he also had served as Assistant District Attorney, as District Attorney, and for six years as a Superior Court judge. *Id.* He had both prosecuted and defended criminal cases, but before Waters' trial Davis had not handled a capital case in the post-*Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), era. Manning had. Less than two years before Waters' trial, Manning had been co-counsel in another Georgia capital case in which the defense succeeded in obtaining a sentence of life imprisonment instead of death.

The state collateral proceeding court and the district court rejected Waters' claim that he had received ineffective assistance of counsel at the sentence stage. The panel majority reversed the district court. It concluded, and Waters argues, that there are five constitutionally significant shortcomings in the performance of Waters' trial counsel at the sentence stage. 979 F.2d at 1492–97.[2] In order to explain our conclusion that Waters has failed to establish that he received ineffective assistance of counsel at sentencing, we will discuss those five alleged shortcomings in turn.

## A. THE CONTENTION THAT COUNSEL SHOULD HAVE ELICITED ADDITIONAL MITIGATING CIRCUMSTANCES EVIDENCE FROM THE MEDICAL EXPERTS

■ The first alleged shortcoming Waters identifies in counsel's performance is their failure to elicit from the medical experts who testified all of the conceivable mitigating circumstance evidence. We begin by differing with the premise of this contention, that:

---

**2.** Having prevailed on the sentence stage ineffective assistance of counsel issues before the panel, Waters' arguments to the en banc Court on these issues essentially mirror the holdings of the panel majority opinion. For the sake of simplicity, in this part of our opinion, we will refer to Waters' contentions and the panel majority's holdings jointly as his position, even where there is some difference in elaboration between the two.

All citations to the panel opinion are to the majority opinion, except where explicit reference is made to Chief Judge Tjoflat's opinion concurring in part and dissenting in part.

"[T]his court has repeatedly recognized that counsel's failure to introduce evidence of mental illness at the sentencing stage renders his or her performance constitutionally deficient." 979 F.2d at 1494. While this Court has held that the failure to introduce mental illness mitigating circumstance evidence can, in some circumstances, amount to ineffective assistance of counsel, *e.g.*, *Blanco v. Singletary*, 943 F.2d 1477, 1503 (11th Cir. 1991), *cert. denied*, — U.S. —, 112 S.Ct. 2282, 119 L.Ed.2d 207, *and cert. denied*, — U.S. —, 112 S.Ct. 2290, 119 L.Ed.2d 213 (1992); *Armstrong v. Dugger*, 833 F.2d 1430, 1432–34 (11th Cir.1987), we have never held that counsel must present all available mitigating circumstance evidence in general, or all mental illness mitigating circumstance evidence in particular, in order to render effective assistance of counsel. To the contrary, the Supreme Court and this Court in a number of cases have held counsel's performance to be constitutionally sufficient when no mitigating circumstance evidence at all was introduced, even though such evidence, including some relating to the defendant's mental illness or impairment, was available. *E.g.*, *Darden v. Wainwright*, 477 U.S. 168, 184–87, 106 S.Ct. 2464, 2473–74, 91 L.Ed.2d 144 (1986); *Stevens v. Zant*, 968 F.2d 1076, 1082–83 (11th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993); *Francis v. Dugger*, 908 F.2d 696, 702–04 (11th Cir.1990), *cert. denied*, 500 U.S. 910, 111 S.Ct. 1696, 114 L.Ed.2d 90 (1991); *Stewart v. Dugger*, 877 F.2d 851, 855–56 (11th Cir.1989), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990). In an even larger number of cases we have upheld the sufficiency of counsel's performance in circumstances, such as these, where counsel presented evidence in mitigation but not all available evidence, and where some of the omitted evidence concerned the defendant's mental illness or impairment. *E.g.*, *Jones v. Dugger*, 928 F.2d 1020, 1028 (11th Cir.), *cert. denied*, 502 U.S. 875, 112 S.Ct. 216, 116 L.Ed.2d 174 (1991); *Card v. Dugger*, 911 F.2d 1494, 1508, 1511–14 (11th Cir.1990), *cert. denied*, — U.S. —, 114 S.Ct. 121, 126 L.Ed.2d 86 (1993); *Bertolotti v. Dugger*, 883 F.2d 1503, 1515–19 (11th Cir.1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990); *Daugherty v. Dugger*, 839 F.2d 1426, 1431–32 (11th Cir.), *cert. denied*, 488 U.S. 871, 109 S.Ct. 187, 102 L.Ed.2d 156 (1988); *Clark v. Dugger*, 834 F.2d 1561, 1566–68 (11th Cir.1987), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988); *Foster v. Dugger*, 823 F.2d 402 (11th Cir.1987), *cert. denied*, 487 U.S. 1241, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988). Our decisions are inconsistent with any notion that counsel must present all available mitigating circumstance evidence, or all available mental illness or impairment evidence, in order to render effective assistance of counsel at the sentence stage. *See, e.g.*, *Stevens v. Zant*, 968 F.2d at 1082 ("[T]rial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel.").

■ The lesson to be drawn from our decisions is not that counsel's performance is always, or even usually, deficient if counsel fails to present available mitigating circumstance evidence. Nor is the lesson that the presentation of some mitigating circumstance evidence will always insulate counsel's performance from being condemned as ineffective. Instead, our decisions teach that whether counsel's performance is constitutionally deficient depends upon the totality of the circumstances viewed through a lens shaped by the rules and presumptions set down in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny.

Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). That result is no accident but instead flows from deliberate policy decisions the Supreme Court has made mandating that "[j]udicial scrutiny of counsel's performance must be highly deferential," and prohibiting "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance." *Strickland*, 466 U.S. at 689–90, 104 S.Ct. at 2065–66. The Supreme Court has instructed us to begin any ineffective assistance inquiry with "a strong presumption that counsel's conduct falls within the wide range of reason-

able professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *accord, e.g., Atkins v. Singletary,* 965 F.2d 952, 958 (11th Cir.1992) ("We also should always presume strongly that counsel's performance was reasonable and adequate ...."). Because constitutionally acceptable performance is not narrowly defined, but instead encompasses a "wide range," a petitioner seeking to rebut the strong presumption of effectiveness bears a difficult burden. As we have explained:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary,* 972 F.2d 1218, 1220–21 (11th Cir.1992). We turn now to the facts of this case in order to determine whether some reasonable attorney could have acted as these attorneys did in the circumstances of this trial.

### 1. The Decision to Introduce the Mental Illness Evidence at the Guilt Stage

■ In the course of presenting an insanity defense at trial, counsel presented a substantial amount of mental illness mitigating circumstance evidence. They did not present any additional evidence at the sentence stage for reasons they explained at the evidentiary hearing in state court. Davis testified that they had presented at the guilt stage all of the witnesses they felt would be helpful to Waters on sentencing. In his words, they offered nothing new at the penalty phase, "because I thought that we had put in our whole load in the guilt/innocence phase." Manning explained that any evidence that would have been presented at the sentence stage had already been presented at the guilt stage, so they made a strategic decision not to call the same witnesses to testify again to the same facts and opinions. The transcript of the sentence stage proceedings corrobo-

rates counsel's testimony that they made a deliberate decision not to introduce additional mitigating circumstance evidence at that stage. At the beginning of the sentence proceedings, the court stated to trial counsel that: "You have the right to place before the Court, before the jury, any mitigating circumstances that you wish to." Davis responded as follows:

> May it please the Court, the defense understands that it has the right to produce further evidence, however, we do not have further evidence to present at this time. We intend, rather, to rely on the evidence that's already been offered in the case and admitted into evidence in the presence and hearing of the jury. And we reserve only the right to address the jury on the subject of the sentencing phase of this case.

The State did not present any additional evidence at the sentence stage, either. During his sentence stage closing argument, Davis reminded the jury that the court would charge, as it did, that in reaching a sentence verdict the jury should consider all of the evidence submitted at the guilt stage, including mitigating circumstance evidence. In arguing for a life sentence, Davis relied extensively on the guilt stage evidence concerning Waters' mental illness.

A reasonable lawyer certainly could have made the tactical choice these two attorneys did. There is much wisdom for trial lawyers in the adage about leaving well enough alone. Having presented substantial evidence of Waters' serious mental problems, counsel were not required to subject defense witnesses to another round of cross-examination. Nor were counsel required to present redundant evidence. Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess. *See Solomon v. Kemp,* 735 F.2d 395, 404 (11th Cir.1984) ("While attorneys may disagree as to how many or what particular witnesses to call, such is the stuff out of which trials are made."), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985).

## 2. The Mental Illness Mitigating Circumstance Evidence Introduced at the Guilt Stage

Waters contends that counsel should have presented additional mitigating circumstance evidence. We begin consideration of this issue by discussing the mitigating circumstance evidence counsel did uncover and present. As the district court said, "[t]he state court found and the record establishes that counsel extensively investigated petitioner's mental condition, both as to evidence of petitioner's mental state at the time of the crime and as to his psychiatric history and treatment." *See also* 979 F.2d at 1498–99 (Tjoflat, C.J., concurring in part and dissenting in part). Counsel's extensive investigation bore fruit. At the guilt stage, counsel called six mental health experts who testified about Waters' mental problems: a physician who had been treating Waters; a psychologist; a psychiatric nurse; and three psychiatrists. Counsel also introduced medical records documenting Waters' history of mental illness. It is not necessary to detail the extensive evidence of mental state mitigating circumstances counsel presented through these witnesses and documents. Instead, we quote the following summary from Waters' own brief to this Court, which belies his claim that counsel were ineffective in presenting mental state mitigating circumstance evidence:

> Despite the jurors' decision that the defendant was not "insane" there was substantial evidence that Waters was seriously mentally ill. Indeed, all six of the medical experts who testified agreed that Waters suffered from some form of mental illness, and Waters was under active treatment for schizophrenia for at least four years preceding the murders. Dr. Wiley Lewis, the general practitioner who first treated Waters considered schizophrenia "a distinct possibility" and prescribed the powerful anti-psychotic medication, Thorazine. Saradell Cureton, the psychiatric nurse who monitored Waters beginning in 1978 remembered him as depressed and fearful about himself and his potential for violence. Cureton testified that Waters was "getting messages from God that were disturbing him [and he] had a great deal of fear about his own actions and reactions." Dr. Lorenzo Lecumberri, to whom Cureton referred Waters diagnosed "schizophrenia, paranoid type" and defined schizophrenia as a mental disease that "affects [a person's] thought and his behavior." Dr. Lecumberri prescribed Mellaril, an even more powerful anti-psychotic. Dr. Miguel Bosch, the forensic psychiatrist who examined Waters after his arrest agreed with the diagnosis of paranoid schizophrenia. Bosch's testimony emphasized the importance of Waters' anti-psychotic medication, and agreed that if Waters stopped taking his medication he might have become "acutely psychotic." Jerry Bowman, the psychologist who examined Waters, testified that Waters had stopped taking his medication at the time of the murders. Even Dr. Hosea De La Torre, who questioned the schizophrenia diagnosis, agreed that Waters was mentally ill. In short, there was evidence of long-term mental illness, serious enough to prompt two suicide attempts and the failure of the medication designed to control it. There was no expert testimony that disputed the fact that Waters was mentally ill. There was no expert testimony that said Waters was "insane."

Petitioner's En Banc Brief at 37–38 (record references omitted; alterations in original); *see also* 979 F.2d at 1498–1500 (Tjoflat, C.J., concurring in part and dissenting in part) (summarizing trial testimony of the six mental illness expert witnesses for the defense). Waters has not referred us to any case in which we have concluded that counsel who presented this much mental state mitigating circumstance evidence was ineffective for failing to present more.

## 3. The Additional Mental Illness Mitigating Circumstance Evidence Waters Contends Should Have Been Introduced

It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called, or, if they were called, had they been asked the

right questions. This case is no exception. But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance. This case is no exception in that respect, either. That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel. As we have noted before, "[i]n retrospect, one may always identify shortcomings," *Cape v. Francis*, 741 F.2d 1287, 1302 (11th Cir.1984), *cert. denied*, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 245 (1985), but perfection is not the standard of effective assistance.

The widespread use of the tactic of attacking trial counsel by showing what "might have been" proves that nothing is clearer than hindsight—except perhaps the rule that we will not judge trial counsel's performance through hindsight. *See, e.g., Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight."); *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir.1992) ("Most important, we must avoid second-guessing counsel's performance. As is often said, 'Nothing is so easy as to be wise after the event.'" (Citation omitted.)); *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992) ("Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight."); *Thompson v. Wainwright*, 784 F.2d 1103, 1106 (11th Cir.1986) ("Hindsight, however, is not the appropriate perspective for a court to examine counsel's effectiveness."). We reiterate: "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Foster v. Dugger*, 823 F.2d 402, 406 (11th Cir.1987), *cert. denied*, 487 U.S. 1241, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988), *quoted in Atkins v. Singletary*, 965 F.2d at 960.

■ As examples of how counsel could have done better, Waters points out that since the trial the psychologist witness, Jerry Bowman Stewart, has submitted an affidavit saying that in her opinion Waters' mental illness would have affected his conduct on the day of the murder and in her opinion it would have been consistent for him to have been hallucinating that day. *See* 979 F.2d at 1494. The opinion of that witness, who had only a bachelor's degree in psychology and a master's degree in counseling, was contradicted by the opinion of Dr. Bosch, a psychiatrist, who testified that he found no connection between the killings and Waters' mental condition and that, in his opinion, Waters was "not psychotic" and was "not acting under the influence of a delusional compulsion" on the day of the murders; instead, Dr. Bosch testified, Waters was "aware of his behavior." The carefully crafted statement in Stewart's affidavit, that "[i]t would be consistent with what I know of his condition for him to have been hallucinating," leaves open the possibility that it also would be consistent with what she knew of his condition for Waters not to have been hallucinating when he murdered the two women. Dr. Bosch, who examined Waters the same year he committed the crime, testified at trial that Waters had not hallucinated in two or three years.

Moreover, not only is there no factual predicate in Stewart's affidavit or in the trial record for her conclusory statement about the possibility of hallucinations at the time of the murders, Waters' entire course of conduct on that day, which he described in his confession as well as in his trial testimony, is inconsistent with his having been hallucinating while he was committing the crime. Waters described in detail his activities in the hours preceding the murders of Ms. Paseur and Ms. Culpepper. He recounted observing a sailboat in the river and two people fishing. He described driving his car onto a narrow dirt lane, seeing the "two ladies," Ms. Culpepper and Ms. Paseur, climbing the incline from the beach to Ms. Culpepper's red car, which was parked on the dirt lane. Waters recalled pulling his car alongside Ms. Culpepper's. He testified that he pulled a gun and a pair of handcuffs from his pockets. Then,

he testified, "I just—I told them that they were going to go with me. And I marched them across some, something like a hundred yards, to a wooded area where its real brushy. And I guess my intentions was sex; I don't know." Waters recalled: ordering Ms. Culpepper to handcuff herself to Ms. Paseur; ordering Ms. Culpepper to undress from the waist down; and orally sodomizing her. According to Waters, after he allowed Ms. Culpepper to dress, "her and Miss Paseur both at the same time made a lunge, and I don't know, I just—I had the gun on them and I pulled the trigger. And I believe that I struck Mrs. Culpepper, and then as she fell back, I shot Miss Paseur." Waters' testimony belies the equivocal suggestion in Stewart's post-trial affidavit that Waters might have been suffering from hallucinations when he committed the murders. If Stewart had testified at trial that Waters killed because he was suffering hallucinations, her credibility probably would have been undermined to such an extent that it would have rendered worthless the testimony she did give for the defense. The failure to adduce additional testimony from her was not ineffective assistance.

█ Trial counsel is also faulted for not eliciting from Dr. Bosch, one of the three psychiatrists who testified for the defense, testimony: "that Waters has a 'serious mental disorder' that should be considered a 'strong mitigating factor' and his opinion that Waters does not appear to have a 'criminal type personality.' " 979 F.2d at 1494. We discuss the three parts of this charge against trial counsel separately. As for the first part, the contention that trial counsel should have gotten Dr. Bosch to use the term "serious mental disorder," even Waters' present counsel concedes that trial counsel did present "substantial evidence that Waters was seriously mentally ill." Petitioner's En Banc Brief at 37. We have quoted on pp. 1513–14, above, a summary from Waters' own brief of that extensive evidence. Some of that evidence was the testimony of Dr. Bosch. *See* 979 F.2d at 1500 n. 3 (Tjoflat, C.J., concurring in part and dissenting in part) ("Dr. Bosch, for example, testified *at length* about Waters' paranoid-schizophrenic condition: his feelings of persecution, anxiety, loss of

control, anger, depression, and his great need for continuous drug therapy in strong doses."). In view of all the evidence trial counsel presented about Waters' mental illness, we will not hold counsel ineffective because he did not get Dr. Bosch to utter the magic words "serious mental disorder."

█ As for the contention that trial counsel was ineffective for failing to ask Dr. Bosch to express his opinion that Waters' mental state should be considered a "strong mitigating factor," neither a psychiatrist nor any other mental health expert is competent to express an opinion about whether a particular set of facts constitutes a mitigating circumstance and, if so, whether it is a strong one. We will not hold counsel ineffective for failing to ask a witness to express an opinion that would invade the province of the judge and jury. *Id.* (Tjoflat, C.J., concurring in part and dissenting in part) ("I cannot believe that, even if Davis had tried to do so, the prosecutor and the trial judge would have allowed Davis to elicit from Dr. Bosch or any other witness what would amount to a jury instruction on mitigation."). Finally, as for the contention that counsel was ineffective for failing to ask Dr. Bosch to express an opinion as to whether Waters had a "criminal type personality," no one suggested that Waters, who had worked as a jailor at the Waycross city jail and for whom there was no evidence of a criminal history, was a "criminal type personality." It was undisputed that Waters is a law-abiding citizen except, of course, for the fact that he kidnapped, abused, and murdered two women.

### 4. The Medical Experts' Awareness of What They Would Be Testifying About

█ Another contention is that, "the evidence presented at Waters' state habeas proceeding established that the medical experts had *no idea* that Davis intended that they testify as to mitigating circumstances during the guilt-innocence phase." 979 F.2d at 1494. Trial counsel called at the guilt stage six medical experts who gave extensive testimony that was mitigating in nature. Waters' present counsel submitted affidavits from

three, and only three, of those medical expert witnesses. None of them stated that the witness was unaware of counsel's intent to have him or her testify about mitigating circumstances during the guilt stage. Instead, in the affidavits, Dr. Bosch stated that counsel "never discussed with me the possibility of my testifying at the penalty phase"; Dr. Lecumberri stated that he "was not asked to testify at the penalty phase"; and Stewart stated that counsel "never discussed with me, as I recall, any use of my testimony during the penalty phase." Each of those statements is entirely consistent with trial counsel's strategy of putting all of the mental illness evidence in at the guilt stage. At the state habeas hearing, Davis testified that he had discussed mitigating circumstances with Dr. Bosch before trial and asked Dr. Bosch to address himself to that subject. Manning testified that before trial he and Davis directed the attention of each medical expert to mitigating circumstances. Thus, the evidence indicates that counsel discussed mitigating circumstances with each of the medical experts, even though counsel may not have discussed with three of them the possibility of their testifying at the penalty phase. The mitigating circumstance evidence counsel intended to introduce was in fact introduced at the guilt stage. In any event, even if none of the medical experts knew that trial counsel intended that he or she testify as to mitigating circumstances during the guilt phase, that fact would not constitute ineffective assistance of counsel. Witnesses testify by answering questions, and it is not a *sine qua non* of effective assistance that an attorney discuss trial strategy with witnesses.

### 5. Counsel's Awareness of Post–*Furman* Law and of the Importance of Mitigating Circumstance Evidence

It is also contended that trial counsel "appears not to have focused *at all* on establishing mitigating circumstances." 979 F.2d at 1494. In view of the quantity of the mitigating circumstance evidence counsel presented,

see p. 1513, *supra,* and pp. 1517–18, *infra,* Davis' specific reference to and reliance upon mitigation in closing argument, and the testimony of both Davis and Manning at the state evidentiary hearing about their strategy, we disagree.

We also disagree with the contention that, "Davis had no idea about the existence of *Furman, Lockett,* and their progeny; he had no idea of the necessity of introducing mitigating evidence and arguing the balancing of aggravating and mitigating circumstances at the sentencing hearing." 979 F.2d at 1494. Davis was joined throughout the representation by Don Manning, an assistant public defender, who just two years before this trial had served as co-counsel in another Georgia capital murder case. That trial had resulted in a murder conviction, but Manning and his co-counsel had succeeded in obtaining a sentence of life imprisonment instead of death for the defendant. It strains credulity to suggest that having recently and successfully participated in a post-*Furman* capital case in Georgia, Manning would not have known about *Furman, Lockett,* and related law, or that he would have hidden his knowledge from Davis in this case. Furthermore, the quantity of mitigating circumstance evidence that Davis succeeded in introducing, his closing argument which specifically referred to and discussed mitigating circumstances, and the testimony of Manning and Davis at the state habeas proceeding, establishes that both trial counsel were aware of post-*Furman* capital punishment law and the function of mitigating circumstances.

We reject on factual grounds Waters' more specific argument that trial counsel did not understand the difference between insanity as a defense and mental illness as a mitigating circumstance. Davis' testimony at the state court evidentiary hearing was ambiguous on this point.[3] However, his actions at trial leave us with no doubt that he knew that mental illness evidence that falls short of 'establishing insanity as a

---

3. Although Davis answered in the affirmative a leading question stating that he had thought the same insanity instructions would be given in both halves of the trial, he flatly denied that he had thought the same legal standard applied.

Moreover, Davis testified he had talked with Dr. Bosch, the psychiatrist, "about mitigating circumstances more than right and wrong," and testified he recognized "that the Georgia test for insanity is the right and wrong test."

defense is nonetheless mitigating circumstance evidence relevant to the sentencing decision. For one thing, all or virtually all of the substantial amount of mental illness evidence counsel presented was evidence that established mental illness as a mitigating circumstance, but not insanity. Every one of the six mental health experts called by the defense testified that Waters was mentally ill, but none of them testified that he did not know the difference between right and wrong, the Georgia test for insanity as a defense. *See* pp. 1513–14, *supra.* As Davis testified at the evidentiary hearing, when the trial began he felt he was "trying the case to save this man's life rather than get a not guilty verdict." Davis' closing argument at the sentence stage establishes that he knew the difference between insanity as a defense and mental illness as a mitigating circumstance. After the jury had determined by its guilt stage verdict that Waters was not insane, Davis argued at the sentence stage that a life sentence was nonetheless appropriate because of Waters' mental illness, which the jury had already found fell short of insanity.

As for the contention that Davis had no idea of the necessity of arguing the balancing of aggravating and mitigating circumstances at the sentencing hearing, we agree that he did not. Neither do we. Georgia's post-*Furman* capital punishment statute does not provide for the balancing of aggravating and mitigating circumstances. *See, e.g., Barclay v. Florida,* 463 U.S. 939, 954, 103 S.Ct. 3418, 3427, 77 L.Ed.2d 1134 (1983) ("Unlike the Georgia statute, however, Florida law requires the sentencer to balance statutory aggravating circumstances against all mitigating circumstances...."); *Zant v. Stephens,* 462 U.S. 862, 873–74, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983); *Ford v. State,* 257 Ga. 461, 360 S.E.2d 258, 261 (1987) ("In this state, juries are not required to balance aggravating circumstances against mitigating circumstances."), *cert. denied,* 485 U.S. 943, 108 S.Ct. 1124, 99 L.Ed.2d 285 (1988). Georgia's statute provides that once a single aggravating circumstance is shown, all aggravating and mitigating circumstances are relevant and considered by the jury, but they are not weighed against each other. We will not,

of course, hold counsel ineffective for not being confused about the law.

**B. THE CONTENTION THAT COUNSEL SHOULD HAVE ELICITED ADDITIONAL MITIGATING CIRCUMSTANCE EVIDENCE FROM WATERS' SISTERS**

█ The second constitutionally significant shortcoming that Waters alleges in the performance of trial counsel is their failure "to elicit a wealth of available mitigating evidence from Waters' sisters." 979 F.2d at 1494. Trial counsel did call eight non-expert witnesses to testify on Waters' behalf, including his former employer, his minister, his three sisters, his brother-in-law, and his wife. They testified that Waters was a nice, quiet, religious, and trustworthy man, who cried uncontrollably with remorse for what he had done, and who cooperated with authorities. As even Waters' present counsel concedes:

> At the guilt/innocence phase of Waters' trial a substantial body of evidence was introduced which was "constitutionally relevant" to a capital sentencing jury. Evidence of Waters' mental illness predominated, but there was also testimony concerning his quiet nature, his religious devotion, his remorse, his cooperation with authorities and his history of suicide attempts and failed medicine.

Petitioner's En Banc Brief at 24 (citation and references omitted). Waters argues that trial counsel could have gotten more testimony from Waters' sisters about his troubled childhood, his history of mental illness, and his lack of violent behavior. Through testimony of one of the medical experts, counsel did put evidence before the jury about Waters' alcoholic father and his "rough childhood." As for Waters' lack of a history of violent behavior, no one ever suggested that Waters had been violent before he kidnapped the two women, handcuffed them, and while they were helpless, sodomized one and shot both. *Cf. Griffin v. Wainwright,* 760 F.2d 1505, 1512 (11th Cir.1985) ("Surely, counsel is not required to call a witness to testify to facts such as lack of violent nature when the jury has rejected such an approach and has found the defendant is guilty of murder."), *vacated*

*on other grounds,* 476 U.S. 1112, 106 S.Ct. 1964, 90 L.Ed.2d 650 (1986), *reaffirmed,* 874 F.2d 1397 (11th Cir.1989).

The test for ineffectiveness is not whether counsel could have done more; perfection is not required. *E.g., Atkins v. Singletary,* 965 F.2d 952, 960 (11th Cir.1992) ("Trial counsel did enough. A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance."). Nor is the test whether the best criminal defense attorneys might have done more. Instead, the test is whether some reasonable attorney could have acted, in the circumstances, as these two did—whether what they did was within the "wide range of reasonable professional assistance," *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984); *White v. Singletary,* 972 F.2d 1218, 1220 (11th Cir. 1992). We answer that question in the affirmative.

## C. THE CONTENTION THAT COUNSEL PRESENTED HARMFUL EVIDENCE

The third constitutionally significant shortcoming in counsel's performance is alleged to be the presentation of testimony "that was not only very harmful but was devastating to his client's plea for life." 979 F.2d at 1494. Three particulars are specified, and we will address each in turn.

### 1. Calling Dr. DeLatorre as a Witness

First, it is asserted that Dr. DeLatorre, a psychiatrist, should never have been called to the stand because his *"entire testimony* was harmful to Waters." 979 F.2d at 1495. Particularly harmful, it is said, was Dr. DeLatorre's testimony that Waters was in good contact with reality and suffered from anxiety neurosis instead of paranoid schizophrenia. *Id.* None of the six medical experts testified that Waters was not in good contact with reality at the time of the murders. There was little or no disagreement on that issue. There was disagreement about which mental illness Waters suffered from, but of course, "psychiatrists disagree widely and frequently on what constitutes mental

illness [and] on the appropriate diagnosis to be attached to given behavior and symptoms." *Ake v. Oklahoma,* 470 U.S. 68, 81, 105 S.Ct. 1087, 1095, 84 L.Ed.2d 53 (1985). As a result, sometimes defense counsel will have more than one way to paint a picture of mental illness. Dr. DeLatorre diagnosed Waters' mental illness as "anxiety neurosis" instead of "paranoid schizophrenia," which was the diagnosis Dr. Lecumberri and Dr. Bosch gave. However, trial counsel elicited from Dr. DeLatorre the testimony that "there's not too much difference" between the two types of mental illness, and that people who suffer from anxiety neurosis mental illness "react different than normal people, exaggerate [their] actions, become violent at times." Anxiety neurosis, the witness explained, involves "mixed symptoms of different types of mental illnesses, but the person is always in good contact with reality." Being in good contact with reality for periods of time is apparently not inconsistent with paranoid schizophrenia. Dr. Lecumberri, who testified that Waters was a paranoid schizophrenic, also testified that he was "in good contact" and "not psychotic" when he last saw him before the murders. It is telling that even Waters' present counsel lists Dr. DeLatorre's testimony as part of the "substantial evidence that Waters was seriously mentally ill." Petitioner's En Banc Brief at 37.

The testimony of Dr. DeLatorre was not harmful to counsel's effort to obtain a sentence less than death for Waters. It was part of the evidence counsel presented from mental health experts with different perspectives and diagnoses, all of whom agreed that Waters suffered from a serious mental illness. Being in contact with reality does not rule out a serious mental illness, nor does it preclude the finding of mental state mitigating circumstances. A reasonable attorney could have decided that having Dr. DeLatorre, the Medical Director of the Forensic Division at the Central State Hospital, testify that Waters was mentally ill was important enough to outweigh his testimony that Waters was, despite his mental illness, in good contact with reality. Such are the strategic decisions that trial counsel are called upon to

make. We cannot, and will not, second guess such decisions. *See, e.g., Hance v. Zant,* 981 F.2d 1180, 1184 (11th Cir.) (rejecting a claim that counsel was ineffective for presenting testimony of a psychologist which "contained both favorable and unfavorable elements"), *cert. denied,* — U.S. —, 114 S.Ct. 317, 126 L.Ed.2d 263 (1993).

## 2. Calling Waters as a Witness

■ The second specification of allegedly harmful evidence presented by counsel was Waters' own testimony. The decision to have Waters take the stand cannot be considered reasonable, it is contended, because "Waters' testimony did not give the jury *any* information that was not already in the record." 979 F.2d at 1495. Underlying that conclusion is an assumption that the only reason a defendant should ever testify is to convey factual information that cannot otherwise be presented. Skilled defense counsel realize, however, that putting the defendant on the stand sometimes can help "humanize" him in the eyes of the jury. It may be more difficult for a jury to condemn to death a man who has sat on the stand a few feet from them, looked them in the eyes, and talked to them. Trial counsel testified that at the guilt stage he was trying to save Waters' life, that he felt it important for the jury to see Waters as a person, and that he wanted Waters to testify for that reason. Notwithstanding the dangers in putting Waters on the stand, trial counsel "decided on the balance that he stood to come out better if he testified than he would had he not testified. That was my judgment in the matter." It was a calculated strategic decision. As the Supreme Court has noted, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065. Attorneys will disagree about whether to have the defendant testify in a particular case. There is no one right answer to that question, which is one of the most difficult counsel faces in a capital case. We cannot say that no reasonable attorney in this position would have put Waters on the stand.

## 3. Some of Dr. Bosch's Testimony

■ Trial counsel is also faulted for bringing out from Dr. Bosch the opinion that Waters "attacked his victims to fulfill his sexual desire and that there was no relationship between Waters' mental illness and the killings." 979 F.2d at 1495. Dr. Bosch testified that Waters was a paranoid schizophrenic who had suffered from that mental illness for more than twenty years. He testified that if Waters went without his medication—as other evidence indicated he had—Waters' condition could worsen, leading to adverse symptoms ranging from increased nervousness to "a real acute, psychotic brain." Dr. Bosch also testified about Waters' two suicide attempts—in the first one he shot himself in the stomach, and in the second one he swallowed poison.

It is true that during re-direct examination, Dr. Bosch testified that he could not find any connection between Waters' mental illness and the crime. However, Dr. Bosch had already testified during cross-examination by the prosecutor that, in his expert opinion, at the time of the crime Waters knew right from wrong, was not psychotic, was not acting under the influence of a delusional compulsion, and was aware of what he was doing. Thereafter, while trial counsel was attempting to extract favorable evidence from Dr. Bosch during re-direct examination, the witness referred back to what he had said during cross-examination and reiterated that he could find no connection between Waters' mental illness and the crime. But the jury had already heard his testimony to that effect during cross-examination.

Dr. Bosch's testimony during re-direct examination that in his opinion Waters' attack on the women was motivated by the desire to have sex with them also resulted from trial counsel's attempt to extract favorable testimony from the witness. Dr. Bosch had previously testified about Waters' suicide attempts and the feelings of depression, inadequacy, and confusion which motivated them. Trial counsel attempted to get Dr. Bosch to testify that Waters' actions against the two women were motivated by those same mental and emotional problems. He asked Dr. Bosch to "reconstruct the feeling or the emo-

tion that Kelly Waters felt at the time the crime was committed." Dr. Bosch, instead, said that the crime was motivated by Waters' desire to have sex with the women. That testimony did not help the defense, but we are not convinced that it was harmful. The evidence overwhelmingly established that Waters went looking for women, that he abducted two of them, restrained them, orally sodomized one, and also stripped the other one nude from the waist down. It cannot have been news to the judge and jury that such a crime was motivated by sexual desires. In any event, not every misstep or miscue amounts to ineffective assistance. There may be some attorneys who have tried difficult cases without ever making a mistake, but we doubt it. On the whole—and that is how we are required to judge it—trial counsel's performance was within the wide range of reasonable professional assistance.

D. THE CONTENTION THAT COUNSEL FAILED TO ENSURE THAT THE JURY WAS ADEQUATELY INSTRUCTED ON MITIGATING CIRCUMSTANCES

■ According to Waters, the fourth constitutionally significant shortcoming in counsel's performance is that counsel allegedly "failed to ensure that the jury received guidance concerning how Waters' mental illness could constitute a mitigating factor." 979 F.2d at 1496. That conclusion is based upon perceived deficiencies in counsel's closing argument and in the jury instructions. We find no such deficiencies, and we reject the contention that the jury was not sufficiently informed about mitigating circumstances.

Trial counsel did tell the jury about mitigating circumstances. In the opening part of his closing argument, counsel told the jurors that they would receive a copy of the court's oral charge to them, and he read a portion of the oral charge to the jury in his closing argument. Included in the portion he read to the jury was the instruction that they should consider all evidence submitted at the trial of the case, including any evidence of mitigating circumstances, and that the jury could provide for a life sentence for any reason satisfactory to them or for no reason.

We agree with the analysis and reasoning set out in Chief Judge Tjoflat's dissenting opinion, 979 F.2d at 1501–04, which explains why counsel's sentence stage closing argument, as well as his overall strategy, did not constitute ineffective assistance. Moreover, in part IV of this opinion, we hold that the sentence stage jury instructions were not constitutionally deficient. Because counsel's closing argument and the court's jury instructions are constitutionally sufficient when considered separately, they are also constitutionally sufficient when considered together.

E. THE CONTENTION THAT COUNSEL'S "SPARE HIM FOR SCIENCE" ARGUMENT CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL

■ The fifth constitutionally significant deficiency in trial counsel's performance is said to be that part of his sentence stage closing argument in which he urged the jury to spare Waters' life so that he could be studied for the ultimate benefit of mankind. The exact words of this argument and their context are set out in Chief Judge Tjoflat's dissenting opinion, 979 F.2d at 1501–04. We agree with his conclusion on the issue and with his reasoning.

We add a few observations to what the Chief Judge said. To begin with, this counsel did not invent the "spare him for science" argument. It has been used in other cases. Our opinion in *Goode v. Wainwright,* 704 F.2d 593, 604 (11th Cir.), *rev'd on other grounds,* 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983), indicates that a similar argument was used there. The opinion in that case also indicates that the sentencing judge, while ultimately persuaded by the aggravating circumstances to sentence Goode to death, did at least give consideration to the prospect of sparing his life for scientific study to benefit society. The judge asked in his sentencing remarks: "Could not something be learned from Arthur?" *Id.* at 604. Although our *Goode* opinion does not address whether use of the argument was ineffective assistance of counsel, it certainly contains no hint that it was.

At least three other courts have considered whether use of the "spare him for science" argument constitutes ineffective assistance of counsel. In *People v. Gacy*, 103 Ill.2d 1, 82 Ill.Dec. 391, 468 N.E.2d 1171 (1984), *cert. denied,* 470 U.S. 1037, 105 S.Ct. 1410, 84 L.Ed.2d 799 (1985), the main theme of counsel's closing argument was that it would be better to study the defendant than to have him executed. Holding that the argument should be judged in context and did not amount to ineffective assistance, the Illinois Supreme Court found that counsel reasonably could have decided that such an argument was the best one available under the circumstances of that case, which involved a series of brutal murders. 82 Ill.Dec. at 432–33, 468 N.E.2d at 1212–13. As the court said, counsel could not change the facts of the crime, and he was confronted with the task of making a difficult argument. *Id.* The same is true in this case.

After Gacy filed a federal habeas petition, the United States District Court for the Northern District of Illinois reached the same conclusion as the state supreme court. In holding that use of the argument did not constitute ineffective assistance, the federal district court explained:

> The jury had been hearing for five weeks about the mental and emotional problems of John Gacy. What was needed was a reason not to condemn him to death. Counsel adverted to the mental and emotional problems, but the main thrust of the argument was that Gacy should be sentenced to life imprisonment so that he could be studied to find out why he had committed the murders. There had been serial murders before, and, unless society takes a different approach, they will occur again. "Somebody has to stop this thing." This argument that Gacy should be studied in an effort to prevent this kind of thing from happening again, and that simply putting a mass murderer to death will not prevent other mass murders, may well have been the best argument that could have been made. Counsel also asked for mercy and argued against revenge, but simple appeals to mercy were unlikely to be persuasive against the prosecution's response that Gacy had himself shown no

mercy to any of his victims. Petitioner has suggested no specific argument that would have seemed at the time more likely to dissuade the jury from the death penalty than counsel's argument that petitioner should be spared for the purpose of study. The argument proved unavailing, but that does not demonstrate that it was a bad argument or that a better one was available. There is no basis for concluding that counsel's performance fell below the minimum Constitutional standard.

*United States ex rel. Gacy v. Welborn,* No. 89 C 6392, 1992 WL 211018 (N.D.Ill. Aug. 26, 1992) (unpublished decision) (record references omitted), *aff'd,* 994 F.2d 305 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 269, 126 L.Ed.2d 220 (1993).

The "spare him for science" argument was also used in another case. In *State v. Biegenwald,* 126 N.J. 1, 594 A.2d 172 (1991), "defense counsel repeatedly argued that the jury should vote to spare defendant's life so that medical research could be performed on defendant in an effort to develop a cure for anti-social personality disorder with paranoid traits," 594 A.2d at 202 (Handler, J., concurring). That argument deeply offended one of the judges on that seven-member court, and he would have found its use constituted ineffective assistance of counsel; he sharply criticized the court because it had "brushed aside" the issue. 594 A.2d at 202–04. The court itself specifically noted the argument, 594 A.2d at 178, but apparently concluded that its use had not constituted ineffective assistance of counsel; the reversal was on entirely unrelated grounds.

Thus, the contention that use of the "spare him for science" argument constitutes ineffective assistance of counsel finds no support in the decisions of other courts. That contention also reflects a hypercritical, second-guessing of the strategy of the lawyer who was in the trenches in this case and who had to make the best of a bad situation. Writing for this Court more than a decade ago, Judge Vance observed that in regard to strategy decisions, trial counsel's "position in reaching these conclusions is strikingly more advantageous than that of a federal habeas court in

speculating post hoc about his conclusions." *Stanley v. Zant*, 697 F.2d 955, 970 (11th Cir.1983), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984). He explained that counsel's knowledge of local attitudes, and "evaluation of the particular jury, his sense of the 'chemistry' of the courtroom are just a few of the elusive, intangible factors that are not apparent to a reviewing court, but are considered by most effective counsel in making a variety of trial and pretrial decisions." *Id.* Judge Vance's reasoning was vindicated when the Supreme Court, one year later, instructed us: that "counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment," *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; that only acts or omissions "outside the wide range of professionally competent assistance" are deficient for ineffective assistance purposes, *id.*; that our scrutiny of counsel's performance should be "highly deferential," *id.* at 689, 104 S.Ct. at 2065; and, that counsel's strategic choices are "virtually unchallengeable," *id.* at 690, 104 S.Ct. at 2066. All of those directions warrant a holding that use of the "spare him for science" argument in this case did not constitute deficient performance.

Some judges, and some other lawyers, would not have made the same argument that counsel made in this case, but that is not the test. The Supreme Court has recognized that because representation is an art and not a science, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689, 104 S.Ct. at 2065. Three different defense attorneys might have defended Waters three different ways, and all of them might have defended him differently from the way the members of this Court would have, but it does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance.

The notion that any convicted murderer should be treated as of possible utilitarian value to society rather than being viewed as a human being worthy of understanding, forgiveness, and mercy, is offensive to some judges. *See* 979 F.2d at 1497. But the moral sensibilities of judges do not confine the "wide range of professionally competent assistance." The question is not whether the broader implications of counsel's arguments are offensive to us, but whether in view of all the circumstances and under highly deferential review, counsel's strategic decision was within the wide range of reasonableness— reasonableness to the task at hand, not reasonableness as a matter of moral values or philosophy.

It is said that counsel's argument essentially gave the jury the choice of either keeping Waters alive so that he could be studied or putting him to death, and that "[c]ertainly, a reasonable juror could have concluded that the latter alternative was the more merciful." 979 F.2d at 1497. Actually, what counsel argued was that keeping Waters alive and studying him for the benefit of society would be, "the socially acceptable, merciful, biblical, Christian thing to do here." In any event, we do not believe that jurors are motivated solely by considerations of mercy. Jurors might well be motivated more by what is best for society than by what is best for a man convicted of brutally murdering two women. It was not unreasonable for counsel to have thought at least one juror in this case might have been persuaded that, given all the harm Waters had done it was time to get some good out of him, and that the way to do that was to keep him alive for study. One does not have to endorse that kind of rationale and those feelings in order to believe that counsel's strategy might have worked. 979 F.2d at 1504 (Tjoflat, C.J., concurring in part and dissenting in part) ("Whereas the majority seems to be shocked at the approach which Davis took, I am astonished that that approach did not succeed in persuading at least that 'one juror' Davis was hoping to reach."). The strategy Waters' counsel chose did not work, but that does not establish it was an unreasonable one. *See, e.g., Fleming v. Kemp*, 748 F.2d 1435, 1452 (11th Cir.1984) ("A defense attorney is not ineffective solely because his client is sentenced to death."), *cert. denied*, 475 U.S. 1058, 106 S.Ct. 1286, 89 L.Ed.2d 593 (1986); *Alvord v. Wainwright*, 725 F.2d 1282, 1289 n. 12 (11th Cir.) ("[Trial counsel] cannot be faulted simply because he did not succeed."), *modified*,

731 F.2d 1486, *cert. denied,* 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984); *Romero v. Lynaugh,* 884 F.2d 871, 877 (5th Cir.1989) ("Had the jury returned a life sentence the strategy might well have been seen as a brilliant move. That it did not does not mean that it was outside the range of reasonable professional assistance."), *cert. denied,* 494 U.S. 1012, 110 S.Ct. 1311, 108 L.Ed.2d 487 (1990).

## III. DENIAL OF RELIEF ON THE CALDWELL CLAIM

██ Because it held that sentence stage relief was due to be granted on ineffective assistance grounds, the panel did not reach Waters' contention that the district court erred in denying his claim that the prosecutor's closing argument at the sentence stage violated *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). We do reach that claim.[4]

Waters' *Caldwell* claim focuses upon two sentences in the next to last paragraph of the prosecutor's argument. In order to put those sentences back into the context from which Waters has taken them, we quote the entire last three paragraphs of the prosecutor's argument.

> So again, I call on you to follow your oath that you took as a Juror to return a verdict that speaks the truth under the evidence that you heard and under the law of this case. Kelly Waters took two lives, two innocent fellow human beings. I say you may conclude Kelly Waters was the architect of his own misfortune. He planned it; he schemed it; and he killed them. He did his thing. In essence, under the evidence of this case he had sentenced himself. He has written out his own verdict. And he, even in his own words, in his own words when he spoke to his sister, Judy, he said according to his own wife, if I killed those people, I want to die. Your verdict says he killed those people. It's his request that he wants to die, according to the evidence before you. I ask you to show to him the same mercy he showed to them, to Ann and Anita. He showed them no mercy. Why should he be shown mercy. On behalf of the State, we state to you, we have no reservations or hesitation in asking for the maximum punishment as provided by the laws of the State of Georgia, under all of the evidence and the law of this case.

> The late Judge Jack W. Ballenger once said, "When I slept I dreamed that life was beauty, but when I awoke I found that life was duty." When I slept I dreamed that life was beauty, but when I awoke found that life was duty. Let me state to you under Georgia law, a Jury is not responsible for the consequences of their verdict. The Jury is responsible for the truthfulness of their verdict. That's us. Kelly Waters has sentenced himself, under the law and under the evidence of this case. So we ask you to simply do one thing and one thing only. Under the evidence, and under the law, take your time in writing out these verdicts. Have his punishment to meet that which he delivered, and let your verdict speak long, loud and clear to Kelly Waters and say no more, Kelly Waters. Not in Glynn County, Georgia.

> All the instructions that the Court will give you, when you fix his punishment at death, state the reasons why, and please state each and every one of them. You can be assured that Ann and Anita will feel that justice has prevailed. We thank you.

Earlier in his argument, the prosecutor had told the jury:

> I want to say to you that your verdict form that you write out is most important, because the law requires the Jury to write out, to fix and set the punishment under all the evidence that you have heard and de-

---

**4.** This claim is probably foreclosed on *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), non-retroactivity grounds by *Sawyer v. Smith,* 497 U.S. 227, 241–45, 110 S.Ct. 2822, 2831–33, 111 L.Ed.2d 193 (1990). However, because the State did not plead or argue that defense in the district court or in this Court, under *Schiro v. Farley,* ⸺ U.S. ⸺, ⸺–⸺, 114 S.Ct. 783, 788–89, 127 L.Ed.2d 47 (1994), we have discretion whether to decide the *Teague* issue. Because the claim so clearly lacks merit, we exercise our discretion to affirm the denial of relief on the merits instead of on *Teague* grounds. We do not mean to imply, however, that it would have been an abuse of discretion to decide the *Teague* issue, instead.

termine, under the evidence of this case, for you to affix your verdict. We ask that you fix and set his punishment at death.

Waters' contention is that two sentences of the prosecutor's argument undermined the jury's sense of responsibility: "Under Georgia law a jury is not responsible for the consequences of its verdict"; and, "Kelly has sentenced himself under the laws and under the evidence of this case." Those two statements, he maintains, unconstitutionally lessened the jury's sense of responsibility. Whether those two statements viewed out of context might have undermined the jury's sense of responsibility is an issue we need not decide. The challenged statements were not uttered or heard in isolation. We will consider them in the context they were made. It is clear to us that the prosecutor was arguing to the jury that Waters was facing a death sentence because of what Waters had done; he was the one who had gotten himself into the predicament he was in; and the jury should not feel sorry for him, but for his victims. Instead of undermining the jury's sense of responsibility for its sentence verdict, the prosecutor's argument, as a whole, stressed the importance of the jury's verdict and urged the jurors to follow their oath and "return a verdict that speaks the truth under the evidence that you heard and under the law of this case." Moreover, " '[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.' " *Romano v. Oklahoma*, —— U.S. ——, ——, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994) (quoting *Darden v. Wainwright*, 477 U.S. 168, 184 n. 15, 106 S.Ct. 2464, 2473 n. 15, 91 L.Ed.2d 144 (1986)). These remarks did not. Thus, the prosecutor's argument did not contravene the *Caldwell* rule.[5]

**5.** Because the prosecutor's argument did not contravene *Caldwell*, we do not reach Waters' contention that any *Caldwell* error in the argument was not cured, but instead was aggravated, by the jury instructions. The only *Caldwell* claim Waters' raised in the district court was the claim we have discussed involving the prosecutor's argument. Waters did not raise, the district court did not decide, and neither do we, the separate issue of whether the jury instructions themselves

## IV. DENIAL OF RELIEF ON CLAIMS RELATING TO SENTENCING INSTRUCTIONS

Waters raises two related but distinct claims regarding the jury instructions at the sentence stage of his trial. First, he maintains that the sentence stage instructions erroneously incorporated the guilt stage insanity instruction, effectively precluding the jury from considering mental health evidence in mitigation unless such evidence was found to meet the legal definition of insanity. Second, Waters argues that the instructions failed to adequately communicate to the jury the meaning and function of mitigating circumstances. We discuss and reject each claim in turn. For the reasons set out, we conclude that Waters is not entitled to relief on either claim.

### A. INCORPORATION OF GUILT STAGE INSTRUCTIONS

A sentencing jury must be allowed to consider relevant mitigating evidence, including evidence of mental illness that falls short of constituting a legal excuse. *See Eddings v. Oklahoma*, 455 U.S. 104, 113–16, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982). Jury instructions permitting full consideration of mitigating circumstances established by the evidence are essential if the jury is to give a reasoned moral response to the defendant's background, character, and crime. *Penry v. Lynaugh*, 492 U.S. 302, 327–28, 109 S.Ct. 2934, 2951, 106 L.Ed.2d 256 (1989). An instruction is erroneous if there is a reasonable likelihood that the jury has applied it in a way that prevents the consideration of constitutionally relevant evidence in mitigation. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). Jury instructions are not considered in isolation; rather, we view them in the context of the entire sentencing proceeding.

contravened *Caldwell*. *See generally, Mulligan v. Kemp*, 818 F.2d 746, 748 (11th Cir.) (rejecting *Caldwell* attack on jury instructions similar to the ones in this case), *cert. denied*, 481 U.S. 1043, 107 S.Ct. 2171, 95 L.Ed.2d 828 (1987). At oral argument, when Waters' present counsel was asked if he had made a deliberate strategic decision not to raise a *Caldwell* jury instruction claim as a separate issue, he said: "I'm afraid I did."

*Boyde,* 494 U.S. at 378, 380–81, 110 S.Ct. at 1196, 1198; *High v. Kemp,* 819 F.2d 988 (11th Cir.1987); *Peek v. Kemp,* 784 F.2d 1479 (11th Cir.1986) (en banc), *cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986).[6] A petitioner claiming that the challenged instruction prevented the consideration of constitutionally relevant evidence in mitigation must show that there is a reasonable likelihood that the jury applied the instruction in such a manner. *Boyde v. California,* 494 U.S. at 380, 110 S.Ct. at 1198.

■ At the beginning of his sentence stage charge to the jury, the judge included the following language, which forms the basis for Waters' challenge:

> The instructions given you earlier in this case and the rules of law outlined to you in this portion of the instructions apply also to your deliberations as to penalty, that is the rules of law outlined to you in the Charge that I gave you earlier, also apply to your deliberations in arriving at the penalty or punishment in this case.

Waters now claims that the general language quoted immediately above had the effect of incorporating the guilt stage definition of insanity (the right-wrong standard) into the sentence stage instructions, with the result of leaving the jury with the impression that evidence of Waters' mental health could not be considered in mitigation unless his mental disease was so serious that he could not distinguish right from wrong. Because the jury had already found Waters sane, the defense argues, the effect was to preclude the jury from considering constitutionally relevant mental health evidence in mitigation.

However, as noted above, our evaluation must focus not upon the challenged instruction in isolation, but upon the entire sentencing instruction and the entire sentencing proceeding. Other relevant parts of the sentencing charge instructed the jury to consider all evidence submitted in the trial of the case, including any evidence of mitigating circumstances, and instructed the jury that it could provide for a life sentence for any reason satisfactory to the jury or for no reason at all. As discussed below, the charge to the jury to consider mitigating circumstances and that they could return a life sentence for any reason or for no reason at all is inconsistent with Waters' purported interpretation. Moreover, we believe that the broader context of the entire sentencing proceeding further undermines Waters' interpretation. By the time the sentence stage began, the jury had already received substantial evidence that Waters suffered from serious mental illness. The prosecution and defense, rather than introducing new evidence at the sentence stage, instead relied on the previously adduced evidence. In closing arguments at the sentence stage, the prosecution maintained that Waters deserved the death penalty, while the defense argued that Waters should be spared due to his illness. After the arguments, the jury received the instructions, including the challenged portion quoted above.

Waters claims that the prosecutor's closing argument during the sentence stage reinforced the possibility that the jury interpreted the sentencing instructions to incorporate the right-wrong standard. We disagree. Nothing in the prosecutor's argument suggested to the jury that the insanity standard was relevant in fixing punishment. The prosecutor first noted that the jury, in returning a guilty verdict, had found that Waters knew right from wrong and that he was responsible for his actions. This plainly was a summary of the guilt phase. The prosecutor then told the jury that "in this particular phase, this Court . . . [is] going to give you a written copy of his Charge . . . for you to consider in your determining and fixing the punishment. . . ." This juxtaposition carries the clear implication that the new charge referred to by the prosecutor is the charge that is to govern the penalty phase. An unmistakable distinction between the stages was made by the prosecutor, without any implication that the insanity standard remained applicable during the sentence stage. Rather, the implication is that it did not.

The defense argument during the sentence phase also discussed the court's sentencing

---

**6.** *See* note 5 *infra.*

instructions. In his argument, Waters' counsel quoted a portion of those instructions:

> He [the prosecutor] stated to you that you would receive a copy of the Charge of the Court which will be given to you. And indeed you will. I also have a copy, as does [the prosecutor], of that Charge. And before I say any further in connection with the facts in this case, I want to read to you a portion of that Charge, and I ask that you keep it firmly in mind as you go about your deliberations in this case. Members of the Jury, you should consider all evidence submitted in the trial of this case in arriving at your verdict, as to the sentences to be imposed. This will include any evidence of mitigating circumstances received by you in this case. Members of the Jury, even if you find beyond a reasonable doubt that the State has proved the existence of aggravating ... circumstances in this case which would justify the imposition of a death sentence, you are not required to recommend that the accused be put to death. Remember that. You would be authorized under these circumstances to recommend the death penalty, but you are not required to do so. The sentence to be imposed in this case is a matter entirely within your discretion. And you may provide for a life sentence for the Defendant for any reason that is satisfactory to you or without any reason, if you care to do so.

Defense counsel proceeded immediately to argue to the jury that the "unusual circumstance" (*i.e.,* the mitigating circumstance) which warranted the life sentence in this case was Waters' mental illness. He posed for the jury the key question: "The principle problem you have to contend with in this case is ... what went on in the mind of Kelly Waters." The focus of defense counsel's entire argument was Waters' mental illness. If it was not clear before this argument, it was unmistakable afterward that a new charge would be given to the jury to govern the sentence stage, that mitigating circumstances were important, and that the details of Wa-

ters' mental illness were to be considered as mitigating evidence.[7]

The court's charge did begin with the challenged language quoted above, which constitutes a general reference to the continued applicability of the instructions previously given. However, several reasons persuade us that there is no reasonable likelihood that the jury interpreted the sentence stage instructions as incorporating the right-wrong standard from the guilt stage. First, Waters' interpretation is inconsistent with at least two key provisions in the sentence stage instructions themselves. Waters' interpretation is inconsistent with the instruction that the jury "should consider all evidence submitted in the trial of this case" including "any evidence of mitigating circumstances received by you in this case." The court did not tell the jury, as Waters would want us to believe, that it could not consider any of the very considerable evidence of mental illness because it had already been determined that none of it rose to the level of legal insanity. To the contrary, the court told the jury to consider *all* of the evidence they had heard. Moreover, the court expressly included mitigating circumstances. And of course, the jury had just heard defense counsel expressly identify Waters' mental illness as the principle mitigating evidence in the case. Neither the prosecutor nor the court said anything to the jury to suggest that defense counsel was wrong in this regard.

Waters' interpretation is inconsistent with another provision of the sentencing instruction; i.e., the one informing the jury that they could return a life sentence for any reason or for no reason at all. A jury looking at this charge, using its own common experience and common sense, could not believe both that it could base a life sentence on any reason or no reason at all and yet think simultaneously that it could not consider Waters' serious mental illness (albeit it fell short of legal insanity).

---

7. As is apparent from the discussion in the text, and as we hold in Part II.D. of this opinion, we reject Waters' argument that his attorney failed to explain to the jury the role of mental health as a mitigating factor that should impel the jury to impose a sentence of life rather than death. To the contrary, that is precisely the message that the attorney conveyed.

A second reason Waters' interpretation is unpersuasive is that immediately before the sentencing instruction, both the prosecutor's closing argument and even more clearly defense counsel's closing argument spoke of the sentencing instructions in terms that would be inconsistent with Waters' interpretation. As noted above, we find unpersuasive Waters' argument that the prosecutor's closing argument reinforced the possibility that the jury could have interpreted the sentencing instructions to incorporate the right-wrong standard. Rather, as discussed above, the prosecutor's closing argument implied just the opposite, i.e., that the legal insanity issue of knowing right from wrong had already been decided in the guilt phase, and that the trial court was going to give the jury a new written charge to govern the jury's determination in fixing the punishment. As also noted above, defense counsel's closing argument was even clearer, quoting from the sentencing charge to be given shortly including that the jury should consider mitigating circumstances and that the jury could return a life sentence for any reason or for no reason at all. Most significantly, defense counsel made it absolutely clear to the jury that Waters' mental illness was to be considered as mitigating evidence. Thus, by the time the trial court read the sentencing instructions to the jury, the jury already had heard the language actually quoted, and had heard a clear explanation that Waters' mental illness was to be considered as mitigating evidence.

A third reason persuading us that there is no reasonable likelihood that the jury interpreted the sentence stage instructions as incorporating the right-wrong standard from the guilt stage is that many of the guilt stage instructions are obviously inapplicable in the sentence stage. Because Waters had already been convicted at the guilt stage of the two crimes of murdering the two women, guilt

stage instructions that clearly related only to conviction were obviously inapplicable, e.g., the description of the form of the verdict for finding guilt of murder and the elements of the crime of murder. Similarly, we believe that the test for legal insanity was clearly related only to the determination of guilt.[8] Rather, the challenged portion of the sentencing instructions clearly meant that the court was incorporating those instructions from the earlier stage that were applicable to sentencing, such as the distinction between direct and circumstantial evidence, the rules for testing the believability of witnesses, the function of expert witnesses, the admonition that arguments of counsel do not constitute evidence, the statement that the foreman would preside over deliberations, and the definition of reasonable doubt (a standard that applied at the sentence stage only to the finding of aggravating circumstances).

In light of all the circumstances—including the fact that Waters' interpretation is inconsistent with the sentencing instruction itself, the implication in the prosecution's closing argument that the right-wrong standard that was applied in the guilt stage was to be replaced by a new instruction, the similar but even clearer statement in the defense argument, and the fact that the defense argument made it clear that Waters' mental illness was to be considered as mitigating evidence[9]— we conclude that there is no reasonable likelihood that the jury applied the sentence stage instructions in a way that prevented the consideration of constitutionally relevant evidence in mitigation. The instructions clearly left the jury free to consider mental health evidence in mitigation of punishment without applying the right-wrong standard from the guilt stage.

## B. DEFINING THE MEANING AND FUNCTION OF MITIGATION

Waters also claims that the instructions failed to adequately communicate to the

---

8. Waters argues that other references in the guilt stage instructions reinforce his interpretation. For example, he points to the sentence: "Mental abnormality or mere weakness of mind is no excuse unless it amounts to imbecility or idiocy, which deprives the offender of the ability to distinguish between right and wrong." However, the context in which that language appears

makes it clear that Waters could be found *not guilty* only if the insanity standard was met.

9. We also note that defense counsel made no contemporaneous objection. That suggests to us that the participants in the trial did not perceive the challenged instruction in the manner Waters now proffers.

jury the meaning and function of mitigating circumstances in violation of the principles established in *Peek v. Kemp*, 784 F.2d 1479 (11th Cir.1986) (en banc), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986), and its progeny. Petitioner argues that the jury lacked the guidance that would provide means of knowing what elements of the evidence presented during the guilt stage were relevant to the jury's task at sentencing, and did not know how this evidence could be properly employed during sentencing deliberations. Respondent answers that, viewing the sentencing proceeding in its entirety, there was no reasonable likelihood that the jury failed to understand the instructions and the proper role of mitigation.

■ Jury instructions at the sentence stage of a capital trial need not include any particular words or phrases to define the concept of mitigation or the function of mitigating circumstances. *Peek v. Kemp*, 784 F.2d at 1494. We must determine, however, whether there is a reasonable likelihood [10] that the jury failed to understand the challenged instructions and the role of mitigation, taking into account the context in which the

instructions were given. *Boyde v. California*, 494 U.S. 370, 380–81, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). The challenged portion of the instruction did not explicitly define "mitigation," nor did it allocate the mitigating function to the defendant. *See Peek v. Kemp*, 784 F.2d at 1490. An examination of the entire sentencing proceeding is therefore appropriate to determine whether additional information at the sentence stage cast illuminating light. *Boyde*, 494 U.S. at 380–81, 110 S.Ct. at 1198.

In his sentence stage argument, trial counsel for Waters quoted the portion of the instruction that mentioned mitigating circumstances, stressing that the jury should consider all evidence in reaching a sentencing decision and emphasizing that a sentence of life could be returned for any reason satisfactory to the jury or for no reason at all. By doing this, defense counsel clearly indicated that "mitigating evidence" was that which could aid the defendant by leading a jury to impose a sentence of life, even if it found the existence of one or more aggravating circumstances. This facet of the argument gave the jury further enlightenment regarding the na-

---

10. In *Boyde v. California*, the Supreme Court addressed the issue of the appropriate legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of constitutionally relevant evidence. 494 U.S. at 378–81, 110 S.Ct. at 1197–98. The Court recognized that the appropriate standard was not clearly established in its previous cases. It discussed, *inter alia*, the standard used in *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), i.e., what a reasonable juror *could have understood* the charge as meaning. This was the standard applied in our *Peek* decision. Although recognizing that there may not be great difference amongst the several phrasings, the *Boyde* decision settled upon a single formulation: "We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380, 110 S.Ct. at 1198.

However, *Boyde* confirmed the practice in this circuit, *see Peek v. Kemp*, 784 F.2d at 1489–95, of considering the sentencing charge in context to determine whether there is a reasonable likelihood that the jury misunderstood the charge. Like our *Peek* decision, the Supreme Court in *Boyde* relied upon *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) (a

single instruction should not be judged in artificial isolation). Moreover, the Court recognized that "[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with common sense understanding of the instructions in light of all that has taken place at trial likely to prevail over technical hair splitting." 494 U.S. at 380–81, 110 S.Ct. at 1198. *See High v. Zant*, 916 F.2d 1507, 1509 n. 2 (11th Cir.1990) ("*Boyde* ... adopts substantially the same analysis adopted by this court in *Peek....* The only difference in the *Boyde* analysis is its adoption of the reasonable likelihood standard, as opposed to the standard used by our panel, i.e., whether a reasonable juror could have failed to understand the instruction and the proper role of mitigation."), *cert. denied*, 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991).

The *Boyde* standard and analysis has been followed by subsequent Supreme Court cases, *Johnson v. Texas*, —— U.S. ——, ——, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993), *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), and by subsequent Eleventh Circuit cases. *United States v. Chandler*, 996 F.2d 1073, 1085 (11th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994).

ture and role of mitigating evidence. The argument also served to link the function of mitigation to the instruction that the jury could impose a life sentence for any reason or none at all. *See Williams v. Kemp,* 846 F.2d 1276, 1284 (11th Cir.1988), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990). The fact that the focus of the argument was on Waters' mental health—i.e., counsel was obviously arguing to the jury that the reason they should impose a life sentence was because of Waters' mental health—made it clear to the jury that the judge's charge that the jury could impose life for any reason meant that the jury could impose life because of the mitigating evidence of Waters' mental illness. Indeed, as noted above, the defense counsel quoted the part of the sentencing instructions dealing with mitigating circumstances and then argued that the "unusual circumstance" to be dealt with in this case was Waters' mental illness.[11]

Additionally, we note that (as was the case in *Peek v. Kemp* ) the court advised Waters' counsel, in the presence of the jury, that he had "the right to place before … the jury, any mitigating circumstances that you wish to." This further served to clarify that the defendant is the party to present mitigating evidence. *See Peek v. Kemp,* 784 F.2d at 1491.

An examination of the sentencing instructions in the context of the entire sentencing proceeding persuades us that there is no reasonable likelihood that the jury failed to understand the role of mitigation in this case.[12] *See Williams v. Kemp,* 846 F.2d at

1284–85. Therefore, Waters' challenge must fail.

## V. CONCLUSION

We affirm the district court's denial of Waters' habeas petition.

CLARK, Senior Circuit Judge, dissenting in part and concurring in part, in which KRAVITCH and HATCHETT, Circuit Judges, join:

I dissent from part II of the majority opinion. Under the majority's analysis, defense counsel need have no trial strategy, need not find out how witnesses will testify before putting them on the stand, and need not know about the value of mitigating evidence even in a case where the facts require acknowledgment to the jury of a client's guilt. Nor does it matter that counsel unnecessarily puts a client on the stand and has his client describe the gruesome details of the murder of the victims. The promise of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), that death penalties should not be indiscriminately imposed is now lost in this Circuit. Without adequate defense counsel, death without the opportunity for a life sentence becomes a matter of pure chance.

I concur in part I of the majority opinion. Because I would grant Waters relief on the ineffective assistance of counsel claim, I would not reach the issues addressed in parts III and IV of the majority opinion. Thus, I discuss below only the issue addressed by the majority in part II of its opinion: whether

---

11. Petitioner argues that the mental health evidence was not the type that we have found to be self-evidently mitigating in *Peek v. Kemp,* 784 F.2d at 1493. The evidence in question in *Peek* was youth and absence of a criminal record, whereas the primary mitigating evidence in the instant case involved mental illness. Waters contends that mental illness is inherently a "two-edged sword" because it "may diminish [defendant's] blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *See Penry v. Lynaugh,* 492 U.S. 302, 324, 109 S.Ct. 2934, 2949, 106 L.Ed.2d 256 (1989). However, the Supreme Court made this observation in the context of the Texas capital sentencing scheme, which employs a special issue system that specifically inquires as to future dangerousness. Georgia's sentencing

scheme, on the other hand, grants much more discretion to the jury to impose a life sentence, as evidenced by the "any reason or no reason" language in the sentence stage instructions. Viewed in the context of the entire sentencing proceeding, it is clear that Waters' trial counsel was presenting evidence of mental illness in support of a life sentence, and there is no reasonable likelihood that the jury failed to understand that.

12. We note that defense counsel made no contemporaneous objection, suggesting that the participants at trial perceived no difficulty on the part of the jury in understanding the function of mitigating circumstances and the role of Waters' mental illness as mitigating evidence.

Waters' counsel rendered constitutionally effective assistance during the sentencing phase of Waters' trial.

## I.  THE APPLICABLE STANDARD

I agree with the majority as to the standard we must apply in reviewing ineffective assistance of counsel claims: " 'We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.' "  Majority Opinion at 1512 (quoting *White v. Singletary,* 972 F.2d 1218, 1220–21 (11th Cir.1992)).

I disagree with the majority's application of the standard in this case.  Waters' counsel failed to develop a strategy for the sentencing phase of the trial, and his strategy for the guilt phase, if he had one, defeated the objective of obtaining a life sentence for Waters.  Counsel made repeated and flagrant fundamental trial errors which assured that the jury could not view Waters in a sympathetic or merciful light.  It is painfully obvious that the adversarial process at this trial *did not work.*

## II.  A REASONABLE TRIAL STRATEGY

### A.  *The Approach of Competent Counsel*

"No competent defense attorney would go to trial without first formulating an overall strategy."  Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care,* 1993 U.Ill.L.Rev. 323, 356 (1993).  Effective trial lawyers typically prepare for the defense of a criminal case by asking questions such as: (1) What is the objective of the defense?  (2) What is the trial strategy to reach that objective?  and (3) How does one implement that strategy?  In the defense of a death penalty case in particular, counsel's strategy must encompass both the guilt and the sentencing phases of the trial.

> In a capital case, ... some attorneys devise a strategy for the guilt stage without considering the penalty phase.  Others take the position that they will merely "put the government to its burden of proof" at the penalty stage.  Both approaches are inadequate.  Because the penalty trial will be critical if the defendant is convicted of the capital offense, defense attorney must devise a coherent strategy for that proceeding.  Moreover, simply putting the government to its burden of proving its case against the defendant is not a viable option because ... the dynamics of a capital trial are such that the defendant must put on an "affirmative case for life."  Furthermore, because the guilt and penalty trials are integrally related, devising one strategy for the guilt phase and a separate one for the penalty phase is also insufficient.  In order to be effective, a capital defense attorney must develop a consistent theory to be used at the guilt and penalty phases.

*Id.* at 356–57 (footnotes omitted).

In Waters' case, the objective of the defense was to obtain a sentence of life rather than death.  No other objective was possible.  The defense could not possibly convince the jury that Waters had not committed the crimes; he had confessed, and the evidence against him was overwhelming.  As to the insanity defense, the defense did not have a single witness who would testify that Waters met the test for insanity under Georgia law.[1]  Davis admitted at the state habeas hearing that he did not expect to succeed on the insanity defense:

> Q:  Is it fair to say that you didn't expect to succeed on an insanity defense?

> A:  I expected—as a lawyer, as a realistic lawyer, I hoped that the matter of his competence would result in a verdict of a life sentence and not of a death sentence.

---

1. Under Georgia law, "[a] person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence."  Ga.Code Ann. § 16–3–2 (Michie 1992).

Respondent's Exh. 3B at 50–51. Thus, Davis recognized that his overall objective was to obtain a life sentence for his client.

To achieve this objective, a competent trial attorney would develop a strategy aimed at convincing the jury that Waters was a mentally ill human being whose unique circumstances and background made him deserving of the jury's sympathy, compassion, and mercy. To implement this strategy, the competent attorney would prepare mitigating evidence designed to show the jury, for example, that the defendant suffered from schizophrenia, had a troubled background, was not typically violent, and had close family ties. "A capital defense attorney's central mission is to present the defendant's 'case for life' through the introduction of mitigating evidence at the sentencing stage." White, at 360–61.

An effective attorney will educate the jurors as to the capital case procedure and the role mitigating evidence should play in their deliberations; specifically, that mitigating circumstances are "[s]uch as do not constitute a justification or excuse for the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability," thereby reducing the appropriate sentence from death to life. Black's Law Dictionary 1002 (6th ed. 1990). This education of the jury should take place at the beginning of the trial. Particularly when an attorney expects a verdict of guilty, he should explain the bifurcated nature of the capital case, explain that the defense expects a verdict of life rather than death, and then explain mitigating evidence and how it will unfold during the trial to support this verdict. Thus, before the first witness takes the stand, effective counsel has given the jury a framework within which to recognize and consider any mitigating evidence during the guilt phase that might support the plea for life.

### B. *The Approach of Waters' Counsel*

In his defense of Waters, Davis did not act as a competent counsel. Davis' testimony at the state habeas hearing indicates that he understood that the objective of the defense was to obtain a sentence of life rather than death. Nevertheless, he completely failed to develop or implement a trial strategy framework in which to achieve this objective.

Davis' complete failure to develop an effective trial strategy may be explained in part (although not excused) by his lack of experience with death penalty cases. Davis admitted at the state habeas hearing that, prior to Waters' case, his last involvement with a death penalty case was sometime prior to 1961, more than twenty years before Waters' case commenced. Davis practiced law from 1939 until 1955 and served as a state court trial judge from 1955 until 1961. In 1961, Davis was elected to the United States Congress, where he served for 14 years. He retired to Glynn County in 1976, and became the Public Defender in December 1979, less than six months before he became involved in Waters' case. His pre-1961 capital case experience was not only remote in time, but was also largely irrelevant given the immense impact of *Furman v. Georgia* and its progeny upon death penalty jurisprudence. Indeed, Davis tried Waters' case just as a criminal defense lawyer would have prior to *Furman*, when death penalty trials consisted of only one phase and the Supreme Court had yet to declare the important role of mitigating evidence in the jury's decision-making process. Davis did not educate the jury as to the role of mitigating evidence because he was not sufficiently informed as to its significance.

Astonishingly, the majority relies upon assistant public defender Don Manning's experience to support its conclusion that defense counsel was aware of and made effective use of the post-*Furman* capital punishment law. This reliance is ludicrous for a number of reasons. First, Manning did not provide any meaningful assistance to Davis during Waters' trial. Manning's name does not even appear in the trial transcript except to note his presence. He did not question a single witness or make a single statement to the judge or jury. Second, Manning had been practicing law for only a very short time. He had been a member of the bar for only a year and a half and had been with the public defender's office for less than six months when he became involved in Waters' case.

Finally, Manning did not have any meaningful experience. Manning admitted at the state habeas hearing that he had not tried a single felony case prior to the Waters' case. Although he was appointed co-counsel in a death penalty case tried in February 1979, four months after he was admitted to the bar, his testimony indicates that he did not actually try this case himself. It is preposterous for the majority to suggest that Manning's presence somehow compensates for Davis' incompetence.

To the extent Davis did have a strategy for Waters' case, it was to present the defense of insanity in the guilt phase. Davis developed no strategy for the sentencing phase of the trial. Neither did he develop an effective overall strategy to encompass both the guilt and sentencing phases. Rather, he decided to present the insanity defense during the guilt phase of the trial, and he did nothing more. As Manning testified at the state habeas hearing:

Q: If we could move now to the sentencing phase of the trial, if you could describe to the Court any effort to prepare for the sentencing phase.

A: Well, we really didn't have any special preparation for that phase. We—knowing the facts of the case it appeared that Mr. Waters probably would be found guilty based upon his testimony and other evidence. So we considered the totality of the trial. We didn't think well, let's talk about the guilt/innocence phase versus let's talk about the penalty phase. We viewed it as a whole and approached the trial from that standpoint. And we felt that any witnesses that we put up during the guilt/innocence phase, their testimony would be essentially the same in that phase as it would be in the penalty phase. So if we got the testimony in or attempted or tried to in the guilt/innocence, we felt it just be redundant to call those same, very same, witnesses in the penalty case. So we did not call any witnesses in the penalty phase.

Respondent's Exh. 3B at 74–75. Manning even admitted that the defense strategy was *not* prepared with sentencing in mind:

Q: In terms of the defense approached [sic] at trial, is it fair to say that the strategy was essentially a strategy that was prepared with sentencing in mind?

A: No, I don't think that's fair to say. Certainly, that was a consideration but I don't believe that that would characterize the strategy that we had.

*Id.* at 80. Thus, to the extent Davis focused on Waters' case, his emphasis was entirely upon the insanity defense, a defense that he knew would fail.

Davis' blind pursuit of the insanity defense to the exclusion of any other strategy obscured the objective of obtaining a life sentence from the very beginning of the trial. Davis' opening statement at the guilt phase of the trial covers less than three pages in the trial transcript. He told the jury: "We do not contend for any other defense available under the law, except one, and that is, that [Waters] was not in his right mind at the time [of the crimes].... You have a delicate and difficult task to perform in this case; just one, and that is by your verdict to determine the mental condition of the Defendant at the time that these offenses occurred." Respondent's Exh. 1E at 628–30. This is the substance of the opening statement. Other than noting that Waters had attempted suicide, Davis did not mention, much less summarize, any mitigating evidence; indeed, he did not even recite the evidence that would support the insanity defense! Far from educating the jury as to capital case procedure and the role mitigating evidence should play in their deliberations, Davis did not even mention that the jury was embarking on the first phase of a two-phase trial. Indeed, no one—not Davis, not the judge, not the prosecutor—told the jury of the bifurcated nature of the proceedings until after the trial had moved into the sentencing phase. Thus, Davis provided the jury with absolutely no framework within which to consider the limited helpful mitigating evidence he did manage to introduce during the guilt phase of the trial.

By pursuing the insanity defense, Davis sought exoneration for his client. During the initial guilt phase of the trial, the jury learned that Waters sought a verdict of not

guilty, notwithstanding that he admitted committing two heinous murders. Thus, the jury saw a man who sought to escape responsibility for his crimes, rather than a man who was truly sorry for his crimes and sought only mercy on his life. This frustrated any objective of securing a life sentence for Waters.

Davis compounded this problem by failing to educate the jury on the difference between the guilt phase deliberations and the sentencing phase deliberations. Davis failed to explain to the jury that the standard applicable to the insanity defense was very different from the standard applicable to the sentencing decision. Indeed, the jury was never informed that mitigating evidence could justify a sentence of life even if the same evidence failed to establish insanity. A review of Davis' testimony during the state habeas hearing indicates that Davis did not understand the distinction between the guilt phase and sentencing phase deliberations:

Q: During this time period, during this insanity phase of the trial, you were still hoping for one Juror who would decide that the death penalty was inappropriate, is that right?

A: I would hope for twelve Jurors.

Q: What were you hoping at the time?

A: As far as hoping, I was hoping for twelve Jurors to decide that he was insane at the time of the commission of the offense.

Q: And you decided that the penalty phase of the trial would be more or less the same thing, is that right?

A: Well, it wasn't so much a decision on my part. Yes, it was the same, pretty much the same.

Q: And you felt the same evidence would have to be used in the second part of the trial than the first?

A: Yes.

Q: And the same legal standard applied in the second part of the trial as in the first.

A: No, not the same legal standard but the testimony would be virtually the same.

Q: Well, you felt that the instruction in the first half of the trial would be used in the second half of the trial, didn't you?

A: The instructions?

Q: The instructions from the Court concerning insanity?

A: Yes, concerning insanity. Yes.

Q: *And so, when the Court instructed the Jurors about the legal definition of insanity, you felt that would be used in both the guilt phase and the penalty phase of the trial, is that right?*

A: *I suppose so.*

Respondent's Exh. 3B at 62–63 (emphasis added). It is hard to know what Davis was thinking. He may have operated under the mistaken impression that the jury's rejection of the insanity defense imposed some legal constraint upon its sentencing deliberations. To be sure, Davis did nothing to keep the jury from operating under such a misinterpretation.

Davis' pursuit of the insanity defense and neglect of the sentencing phase caused him to ignore, and thereby to fail to elicit and present to the jury, available mitigating evidence that may have convinced the jury to spare Waters' life. Affidavits introduced during the state habeas proceeding indicate that several of the expert witnesses who testified on Waters' behalf would have offered additional evidence in mitigation of Waters' crimes, had Davis elicited this evidence. For example, Ms. Jerry Bowman Stewart, a psychologist, would have testified that Waters "suffered from schizophrenia, a major psychiatric disorder"; that this illness would have affected Waters' conduct on the day of the murders; and that it would have been consistent for Waters to have been hallucinating on that day. Respondent's Exh. 3B at 115–16. Dr. Miguel Bosch would have testified that "Waters was suffering from a serious mental disorder that is called schizophrenic disorder"; that Waters did not have a "criminal type personality"; and that he was surprised that Waters was facing murder charges. *Id.* at 111–12. These affidavits indicate that Davis prepared the expert witnesses only for the insanity defense and did not prepare them to testify as to mitigating circumstances. As Ms. Stewart said in her

affidavit: "[Davis] never discussed with me, as I recall, any use of my testimony during the penalty phase of Mr. Waters' trial." *Id.* at 116. This is further proof that Davis did not understand the bifurcated nature of a death penalty case.

The majority makes several attempts to justify Davis' failure to elicit available mitigating evidence from his expert witnesses. First, the majority opines that the favorable testimony that Ms. Stewart could have offered "was contradicted by the opinion of Dr. Bosch, a psychiatrist, who testified that he found no connection between the killings and Waters' mental condition...." Majority Opinion at 1514. The majority fails to point out that Dr. Bosch's highly prejudicial opinion about Waters *was elicited by Davis on redirect examination.* As is discussed more fully in part III.B. below, Davis made fundamental and egregious errors in his redirect examination of Dr. Bosch by repeatedly eliciting testimony that was harmful to his client. Thus, the majority justifies Davis' failure to elicit favorable testimony from Ms. Stewart by relying on the highly prejudicial testimony that Davis foolishly elicited from Dr. Bosch, evidence that an effective defense attorney would have never presented. This justification by the majority is ludicrous.

Second, the majority excuses Davis' failure to elicit Ms. Stewart's opinion that Waters may have been hallucinating by noting that this testimony would have been inconsistent with Waters' testimony: "Waters' testimony belies the equivocal suggestion in Mrs. Stewart's post-trial affidavit that Waters might have been suffering from hallucinations when he committed the murders." Majority Opinion at 1515. As is discussed in part III.B. below, Davis made a fundamental mistake in putting Waters on the stand; Waters' testimony, at least as elicited by Davis, was devastating to his plea for life. Thus, again, the majority seeks to explain one ineffective act on the part of Davis with the consequence of another ineffective act.

Third, the majority justifies Davis' failure to elicit Dr. Bosch's opinion that Waters did not have a "criminal type personality" by noting: "[N]o one suggested that Waters ... was a 'criminal type personality.' It was undisputed that Waters is a law-abiding citizen except, of course, for the fact that he kidnapped, abused, and murdered two women." Majority Opinion at 1515–16. This justification has the ring of a tasteless joke. It also defies both logic and sound capital trial strategy. In presenting mitigating evidence, a capital defense attorney has several objectives, one of which is "to convince the sentencer that the defendant will not be a future danger if his life is spared." White, at 361. Certainly, presenting evidence that the defendant is not a "criminal type personality" furthers this objective. There is no excuse for Davis' failure to elicit and present to the jury this type of evidence.

Finally, the majority reaches the astonishing conclusion that "the evidence indicates that counsel discussed mitigating circumstances with each of the medical experts." Majority opinion at 1516. The majority is mistaken. At the state habeas hearing, Manning testified:

> Q: During the preparation of the trial, did you ever specifically direct any medical people's attention to the legal idea of mitigating circumstances?
>
> A: Yes, I think with everyone we talked to.

Respondent's Exh. 3B at 82. Manning did *not* testify, however, that either defense attorney talked with all of the medical experts who testified at trial. Indeed, neither Manning nor Davis indicated that they talked with Dr. Hosea DeLatorre prior to trial. As is discussed in part III.B. below, it is obvious from Dr. DeLatorre's trial testimony that Davis had *no idea* what Dr. DeLatorre would say on the stand. Similarly, Dr. Bosch's trial testimony indicates that Davis did not know what Dr. Bosch would say.[2] If Davis did discuss mitigating circumstances with any of

---

**2.** Davis testified at the state habeas hearing that he talked with Dr. Bosch prior to trial; in response to a leading question, he even testified that he asked Dr. Bosch "to specifically address himself to the question of mitigating circum-

stances." Respondent's Exh. 3B at 63. Dr. Bosch, however, attested unequivocally that Davis "did not directly discuss my testimony with me before I testified." *Id.* at 111.

the medical experts, he did not do so effectively, as he left an abundance of mitigating evidence unrevealed.

Davis also failed to elicit available mitigating evidence from Waters' family members. During the guilt phase of the trial, Davis called to the stand Waters' three sisters, the only blood relatives that testified on his behalf. Davis asked one sister only about her endeavors to have certified certain medical documents. He asked the other two sisters only about the events leading up to Waters' arrest. Davis never elicited from any of the sisters testimony touching upon Waters' character, his troubled childhood, his history of mental illness, or his history of attempted suicides. As is evident from the evidence offered at Waters' state habeas proceeding, the sisters were ready and willing to offer testimony on each of these subjects.

Davis also called Waters' wife as a witness during the guilt phase of the trial. Like Waters' sisters, she testified only to the events leading up to Waters' arrest; she offered no insight into his character or his history of mental illness.

In its effort to excuse Davis' failure to elicit favorable mitigating evidence from Waters' family members, the majority contends that Davis did elicit testimony from non-expert witnesses that Waters "was a nice, quiet, religious, and trustworthy man." Majority Opinion at 1517. The majority fails to mention that *none* of this favorable testimony came from either Waters' sisters or his wife. By putting Waters family members on the stand and failing to elicit such testimony, Davis undoubtedly misled the jury into believing that the family had nothing favorable to say about Waters.[3]

Davis not only harmed his client's case by failing to elicit favorable mitigating evidence; he also harmed the case by eliciting evidence that was *devastating* to Waters' plea for life. Under Davis' persistent questioning, Dr. Bosch portrayed Waters as a drunken sex maniac who killed to satisfy a sexual impulse,

Dr. Hosea DeLatorre testified that Waters was "in good contact with reality," and Waters conveyed to the jury in his own words the graphic details of his grisly crimes. None of this evidence is consistent with the objective of portraying Waters as a mentally ill man deserving of sympathy and mercy. Whether Davis elicited this evidence in an attempt to support the doomed insanity defense or because he utterly failed to prepare for trial, he acted incompetently.

Not surprisingly, research shows that "a defendant's unsuccessful attempt to raise an insanity defense positively correlates with a death penalty verdict." Michael L. Perlin, *The Sanist Lives of Jurors in Death Penalty Cases: The Puzzling Role of "Mitigating" Mental Disability Evidence,* 8 Notre Dame J.L.Ethics & Pub.Pol'y 239 (1994). I do not suggest that pursuing an insanity defense during the guilt phase of a capital trial is always unreasonable; the manner in which Davis pursued the defense in this case, however, was senseless. A lay person would have known better. Davis made a decision to present the insanity defense, which he knew could not succeed, and there his strategic planning, if it can be called that, came to a tragic halt. He failed to develop *any* strategy that encompassed the sentencing phase of the trial; as a consequence, his presentation of mitigating evidence, its purpose and role, was woefully inadequate. He may have even failed to understand, and he certainly failed to explain to the jury, the difference between the insanity defense and the sentencing decision. Thus, Davis neither formulated nor implemented a reasonable trial strategy. This incompetency compounded his failure to adhere to fundamental rules of trial advocacy, discussed below.

## III. THE FUNDAMENTAL RULES

### A. *The Rules Followed By Competent Counsel*

An effective defense attorney follows very basic rules during the course of a criminal trial. Among these rules are the following:

---

**3.** *See Stephens v. Kemp,* 846 F.2d 642, 653–54 (11th Cir.) ("The only testimony the jury heard at sentencing concerning appellant's mental history and condition, including bizarre behavior he occasionally exhibited, was that which was presented by his mother. As her testimony makes clear, many others could have testified concerning his behavior; the fact that others did not do so undoubtedly diminished the impact on the jury of the facts she described. [Footnotes omitted.]"), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

1. Never put a witness on the stand without first discussing his or her testimony.

2. Never ask a witness a question without knowing the answer.

3. To the extent possible, insure that evidence that is gruesome or inflammatory is excluded.

4. Never put the defendant on the stand unless there is an essential element of proof that can only be established through the defendant.

5. Never say or do anything during the trial to disparage or diminish the defendant in front of the jury.

6. Identify with the defendant and help the jury identify with the defendant.

These rules are fundamental to good advocacy and are not to be lightly disregarded.

### B. *Davis' Disregard of the Rules*

During the course of Waters' trial, Davis violated each and every one of the six rules listed above, some of them repeatedly. I offer here a few of the most egregious examples.

The first example is Davis' redirect examination of Dr. Bosch. Throughout this examination, Davis asked the witness questions about information the two obviously had not discussed and to which Davis could not have known the answers, thereby violating rules 1 and 2 above. As a result, Davis elicited testimony that was inflammatory and highly prejudicial to Waters (rather than insuring that such testimony was excluded, in accordance with rule 3 above). Specifically, Davis elicited Dr. Bosch's opinion that there was no connection between Waters' mental illness and the crime and his opinion that the "key" to the crime was Waters' sex drive. I reproduce here the bulk of Dr. Bosch's testimony on redirect examination:

A [by Dr. Bosch]: ... As far as the question of his condition at the time of the alleged offense, I dealt with that many times in trying to figure out what was wrong, and I could not put it together, the crime and the mental illness. You know, you're talking about insanity. You're talking about right from wrong and from delu-

sional compulsions, but when we do this kind of work, when we see these people and talk to them and see the crime that they committed, the question that we ask in ourselves, is this connected with this illness, is this a result of this illness.

Q: Well, what's your answer to that?

A: And my—And I couldn't find any connection. That's the reason that I stated to the District Attorney that it is my opinion that at the time of the offense, at the time of the alleged murder that he knew what he was doing.

Q: Well, let me ask you this: How do you reconstruct the feeling of the emotion that Kelly Waters felt at the time the crime was committed? How do you, in your mind, reconstruct that?

.    .    .    .    .

A: I would like to answer the question, but not with the jury present.

Q: Well, we—You will have to ... defer to our wishes in the matter. I asked you to answer it.

.    .    .    .    .

A: ... To answer the question, I would have to get into the, what I consider as, I don't know, it's confidential between me and your client, and the Defendant. And I would have to say something that, what he said to me and I don't know if I should say that in front of the ladies and gentlemen or not. I have some doubt about it.

.    .    .    .    .

A: Well, You Honor, do I have to answer the question? Do I have the right to refuse to answer his questions? ... Your Honor, this is my point: I do have—I can answer his question. I do have the answer. There's no question about it. I can answer his question and hope that he'd be satisfied, but based on my confidential relationship between me and Mr. Waters, I prefer not to answer that question. But I do have the answer. If you ask me to give it to him, I will do it.

THE COURT: Well,

MR. DAVIS: Your Honor, we ask that he give it.

THE COURT: All right. All right. He has waived his privilege, Dr. Bosch.

A: Well, Mr. Davis, this is the answer to your question, and I wrote it down.

Q: All right.

A: It's not something that I'm saying to you today. Now, this is related to the alleged offense. He related to me that he went from Waycross to Brunswick, that he saw two women fishing in that area over there. That he saw the women were getting ready to leave, that he had a gun in his car, that he pulled the gun on those women. And he has stated to me that the reason that he did it was because he wanted to have sex with them, but he could not have sex with them. And he said that he had oral sex with one of the women.

Q: You're saying oral?

A: Oral, yes.

Q: All right.

A: He said that he put the handcuffs on both of them, and I believe on the left and right side of the other one, and then he said that after that—He said that he put the handcuffs on the ladies because they were trying to over power him. And then he shot the older lady, and then he shot the second one, the other one. And then he left, went back to Waycross. He said that he was stopped by a deputy or a state patrol on the road, who checked on him to see if he was drinking, and they let him go. And then later on he got back home. That's what he said to me about the alleged offense.

Q: Yes. Well, I don't object to your reading that. I'm quite happy to have it in the record, but my question didn't quite address that point. My question is: How do you reconstruct the emotional processes that lead to that act that you've just read about?

A: I mean, you—I believe that I got an idea what you're trying to, what you're looking for. You're trying to, asking me how I was able to give an opinion about that he was not . . .

Q: No, I'm not trying to work my way back to anything. I'm just saying,— Awhile ago, for example, you were describing the emotional processes that led to his attempted suicide.

A: Yeah.

Q: Now, I'm trying to ask you to give us your opinion of the emotional processes that led to the event you just read about.

A: Well, most likely, he was in a kind of stage, or emotional condition, more or less, like I saw him in the Liberty County Jail. Maybe he was a little bit tense or a little bit depressed. He had a few drinks on that date. And that he was, maybe like he was going to, when I talked to him, that he was able to relate, able to talk, that he understood my questions and . . .

Q: I'm talking about on April the 25th.

A: Yeah, that's what I said. And I'm sure that his emotional state, whatever he worries about, being maybe a little bit apprehensive, a little bit nervous, a little bit depressed on that date, and because of all of this background that he had, maybe after the first lady, the oldest lady got shot, between that one and the second one, maybe he got a little more apprehensive or a little more fears about what was going on and more, you might say, tight, emotional state, between the shooting between the two ladies, and plus, I'm sure that after the whole incident that, the whole incident, maybe he got a little more tight, a little more upset. And I don't know if that takes care of your question.

Q: *No, it doesn't.* What I'm driving at is, what—Do you think that the whole episode was trying to do something for his own ego or some other reason?

A: My feeling is like I wrote, and I believe that, like I said before, he seemed to be honest with me when he answered my questions. And one of the—I believe the key to the whole thing is that he wanted to have sex. You know, when you drink—Alcohol, like I said, is a sedative. But, you know, alcohol relieves the sexual desire, but take away the performance. When people are drunk—When people drink, they want to have sex, but alcohol takes away the performance from them, and that was the case in this one, was a little bit of sexual impulse was released, but couldn't perform. And this is related

to alcohol. But I believe the main reason, when he saw those two women, that he had some kind of sexual stimulus that he wanted to have sex with. And to me, that's what the key of the whole thing. And again, the episode when one of the women was trying to overpower him and—That's what he said. And again, I believe what he said.

Mr. Davis: I have no further questions.

Respondent's Exh. 1F at 1002–11 (emphasis added). As this testimony indicates, *Dr. Bosch attempted to protect Waters by withholding his most damning opinions. At Davis' insistence,* Dr. Bosch was forced to reveal these opinions to the jury. Thus, Davis succeeded, in a manner akin to a prosecutor, in portraying his client not as a mentally ill man deserving of sympathy, but as a drunken sex maniac who killed to satisfy a sexual impulse.

Davis' conduct in questioning Dr. Bosch in this manner is inexplicable. The issue being tried was whether Waters was insane or not. Either (1) Davis had talked with Dr. Bosch about his testimony, knew what he would say, and intentionally sabotaged Waters' case by eliciting Dr. Bosch's harmful testimony, or (2) Davis had failed to talk with Dr. Bosch regarding his testimony, was woefully ill-prepared for the examination, and blindly stumbled into the devastating line of questioning on redirect. The majority opts for the latter scenario, speculating that Dr. Bosch's devastating testimony "resulted from trial counsel's attempt to extract favorable testimony from the witness." Majority Opinion at 1520. If Davis thought his questioning would elicit favorable testimony from Dr. Bosch, it is because he had *absolutely no idea what Dr. Bosch would say.* With even *minimal* preparation, Davis could have avoided his egregious blunder. That this blunder was due to lack of preparation, rather than to intentional sabotage, does not render Davis' conduct reasonable, as the majority concludes.

The majority also opines that the testimony of Dr. Bosch on redirect examination was not harmful to Waters: "That testimony did not help the defense, but we are not convinced that it was harmful." Majority Opin-

ion at 1520. This conclusion is preposterous. The majority contends that the jury had already heard during cross-examination Dr. Bosch's conclusion that there was no connection between Waters' mental illness and the crime. During cross-examination, Dr. Bosch did testify that Waters knew right from wrong, that he was not psychotic, and that it was "quite possible" that he knew what he was doing when he committed the crimes; Dr. Bosch never even implied, however, that there was *no* connection between Waters' mental illness and the crimes. Thus, during Davis' redirect examination of Dr. Bosch, the jury heard for the first and only time that there was no connection between Waters' mental illness and his crimes, and that the crimes were the result of Waters' drunken impulse to fulfill a sexual desire. It is nonsense to suggest that this redirect examination was not harmful to Waters' plea for mercy.

A second example of Davis' flagrant violation of the fundamental rules of trial advocacy is Davis' direct examination of Dr. Hosea DeLatorre. Davis called Dr. DeLatorre as a witness without knowing what his testimony would be. Thus, Davis again violated rules 1 and 2 listed in part III.A. above. As a result, he elicited *nothing* but evidence that was prejudicial to Waters. I reproduce here Davis' entire direct examination of Dr. DeLatorre, with the exception of his professional background:

Q: All right. I'll ask you if you had occasion to examine the Defendant in this case, Kelly Waters, in the past?

A: That's correct.

Q: Can you state what date you examined him?

A: I saw him the first time the date that he was admitted to the Forensic Services Division in August the 21st, 1980.

Q: And then did you see him more than that one time?

A: I saw him on rounds, mostly once a week, and also, I saw him when he was at Stafford for competent, to decide he was competent to stand trial when he was released from the Binion building.

Q: And over what period of time did you see him once a week?

A: For about a month.

Q: So you saw him approximately four times?

A: Four times in one round, and I got two or three interviews with him.

Q: During the course of those interviews, were you able to form a medical opinion as to his mental condition?

A: Uh ...

Q: Just answer it if you were able ...

A: I got an opinion.

Q: Did you consult his records to find that he had been diagnosed as a paranoid type schizophrenic?

A: I got some information that he was diagnosed as a paranoid schizophrenic.

Q: Did you concur in that diagnosis?

A: No, sir.

Q: You did not?

A: No, sir.

Q: What was your diagnosis?

A: My diagnosis was anxiety neurosis.

Q: What kind of neurosis?

A: It's a neurosis characterized by the feelings of anxiety and ...

Q: I'm not understanding that word.

A: Feelings of anxiety.

Q: Would you ...

A: ... all the time, nervous, tense.

Q: One of your words was anxiety?

A: Anxiety.

Q: And what's the first part of that?

A: Anxious, neurosis, anxiety neurosis.

Q: Anxiety neurosis?

A: Neurosis.

Q: And that was your diagnosis?

A: That was my diagnosis. No, it was not my diagnosis. I was agree with the diagnosis, but the diagnosis was done by a psychiatrist the Binion Building, that he was assigned to a psychiatrist for mental evaluation. He made the diagnosis. And I, as the medical director of the Forensic Division, I need to check, I review all the diagnoses in the Forensic Service Division to see if they are correct. So we make another type of evaluation to see if we are agreed with the diagnoses offered by the psychiatrist before sending the people to the court.

Q: And you disagreed?

A: I was agreed with the diagnosis of anxiety neurosis done in the Binion Building.

Q: You are agreeing with anxiety neurosis?

A: That's correct.

Q: Would you explain to the jury how an anxiety neurosis differs from a schizophrenic condition?

A: The anxiety neurosis, the people in anxiety, when the person feels anxious, there's not too much difference with the schizophrenia.

Q: There's not much difference.

A: Not much difference because the people that feel anxious react different than normal people, exaggerate his actions, become violent at times. At times he feels depressed. It's mixed symptoms of different types of mental illnesses, but the person always is in good contact with reality.

Q: All right.

Mr. Davis: I have no further questions.

Respondent's Exh. 1G at 1013–1016.

In essence, Dr. DeLatorre testified that Waters did not suffer from paranoid schizophrenia, but only from anxiety neurosis, and that he was in good contact with reality. Thus, Dr. DeLatorre's entire testimony was *harmful* to Waters' case. Not surprisingly, the prosecutor's cross-examination of Dr. DeLatorre was extremely short; the prosecutor merely clarified that Waters "was in good contact with reality" and knew the difference between right and wrong. *Id.* at 1016. The majority concludes that a reasonable attorney would have offered Dr. DeLatorre's testimony in support of a plea for mercy or in support of the insanity defense. As with the redirect testimony of Dr. Bosch, Davis' conduct may be explained in one of two ways: either he intentionally sabotaged his client's case by calling Dr. DeLatorre to the stand, or he was not prepared and had no idea what Dr. DeLatorre would say on the stand. (As noted in part II.B. above, neither Davis nor

**1540**

Manning identified Dr. DeLatorre as one of the expert witnesses with whom they talked prior to the trial.) Either way, Davis acted incompetently.

The majority contends that Dr. DeLatorre's testimony "was not harmful to counsel's efforts to obtain a sentence less than death for Waters" because it "was part of the evidence counsel presented from mental health experts with different perspectives and diagnoses...." Majority Opinion at 1519. The majority suggests that counsel cannot be faulted for offering testimony that paints a fuller and more accurate picture of the defendant, even if the testimony is ultimately harmful to the defendant's case. This approach is totally inconsistent with the adversarial process, the integrity of which the ineffective assistance of counsel standard is designed to protect.

A third example of Davis' violation of the fundamental rules of trial advocacy is Davis' unbelievable decision to put Waters on the stand. Davis put his client on the stand even though Waters' testimony could add absolutely nothing to the case for the defense. Davis then elicited from Waters gruesome and inflammatory evidence regarding the details of the crimes. I reproduce here Davis' entire direct examination of Waters:

Q: Your name is Eurus Kelly Waters?

A: Yes sir.

Q: Mr. Waters, until the time of your arrest, you lived with your wife in Waycross?

A: Yes, sir.

Q: Was that at 708 Homer Street in Waycross?

A: That's correct.

Q: And you've now been in jail since early in May of 1980?

A: Yes, sir.

Q: I'll ask you, Mr. Waters, if during the course of your lifetime you have ever attempted to kill yourself?

A: Yes sir, on two occasions.

   .    .    .    .    .

Q: All right, sir. Tell us about that.

A: The first time I attempted to take my life was a gunshot wound. The—I shot myself in the stomach with a .22 caliber rifle. On the second occasion, I taken some poisonous medicine which consisted of a bottle of rubbing alcohol and white linament.

Q: How long ago was the second occasion?

A: Something like 1966.

Q: How long ago was the first occasion?

A: I believe that happened in '64.

Q: Now, your marriage to the present Mrs. Waters, Helen Waters, is your second marriage, is it not?

A: Yes, sir.

Q: And your first marriage, did it end in divorce?

A: Yes, it did.

Q: Was there a child ...

A: Yes, sir.

Q: ... from your first marriage?

A: Yes, sir.

Q: And what age is that child now?

A: Sixteen.

Q: Where does she live?

A: In Lake City, Florida.

Q: Mr. Waters, you were formerly, were you not, a cab driver in Waycross?

A: Yes, sir.

Q: I'll ask you if you can tell us something about the events on and around the date of April the 25th, 1980, involving visits by you to Jekyll Island? For example, now, April the 25th, 1980, was on a Friday. Can you recall the Wednesday before that Friday going to Jekyll Island?

A: Yes, sir, I believe I went to Jekyll Island fishing that day.

Q: On that particular day, can you remember anything that happened?

A: Only I got real bad sunburned.

Q: And how did you get it, were you fishing or lying on the beach, or just ...

A: Both.

Q: ... how?

A: Both.

Q: And can you remember what happened after you left Jekyll that day?

A: The only thing that I remember, you know, that would be considered—I stopped by my sister's house and drank some tea.

Q: All right.

A: Which the sister I'm talking about in question is Georgia Rainey.

Q: All right. Now, then, about the next day, which would have been a Thursday, was there anything unusual about that day that caused you to remember that day?

A: Nothing unusual happened, no.

Q: Then on Friday, you remember, of course, that day, Friday?

A: Vaguely.

Q: Yes. Would you state to the Court what happened? Start out at the beginning of the day and state what happened on that Friday.

A: Mr. Davis, the best of my recollection is that the first thing that I remember as to happening on Friday was taking my wife to work.

Q: All right. And when you took her to work, what did you do?

A: I don't have any idea.

Q: Do you remember being on Jekyll that day?

A: Yes, sir.

Q: Can you tell us what time of day it was when you got to Jekyll that day?

A: Well, I can't be sure, but I would say sometime in the late morning.

Q: Now, you've, of course, sat through this trial, as you're entitled to do under the law. You heard a lady take the stand by the name of Mrs. Googe from Darien.

A: Yes, sir.

Q: Do you remember seeing her that day?

A: Yes, I believe I did talk to her on the beach that day.

Q: You heard what she had to say about the conversation that was had between you and her. Was that . . .

A: Yes, sir.

Q: . . . in accordance with the way you remember it?

A: Yes, sir.

Q: And then following that, can you tell us what happened next?

A: The only thing that—The next thing that comes to my mind, Mr. Davis, is that I was drinking, that I was drinking some alcohol, some whiskey. And in regard to the rest of the day, the only thing that I remember is just what is in the statement that I made to Mr. Curley.

Q: Well, now, we're going to have to go through that. But first I'll ask you a question or two. What were you drinking on that occasion?

A: Calvert's, I believe.

Q: And where had you gotten it?

A: I can't say for sure because I don't know.

Q: Well, what—All right. You don't know. Well, what size bottle was it in?

A: That particular one was a half-pint bottle.

Q: Did you wear it in your pocket when you weren't drinking out of it, that bottle?

A: No sir, I believe that it was in the car.

Q: In your car. Can you remember before the occasion where you encountered the two women who were killed, before that? Can you remember—Did you buy a chaser or go to a store or anything along that line at all?

A: Yes, sir, I believe that I bought some Gatorade, and some coffee, and also cigarettes, at the little Zippy Market, or whatever the name of it is, on Jekyll Island.

Q: Now, where is that Zippy Market located?

A: In the shopping plaza as you go into Jekyll, go onto the island.

Q: Do you know the area that people call the New Marina over there?

A: Yes, I do.

Q: Have you ever fished in it?

A: Many times.

Q: Did you go later after you'd been to this Zippy Mart, or Zippy Market, did you go over to the area of the New Marina?

A: Yes, sir.

Q: And when you got to that—What were you driving?

A: My '74 white Chevrolet.

Q: When you got over there, what did you see, if anything?

A: Nothing stands out in particularly. Now, there was a sailboat there in the river. This marina consists of a large lagoon that makes off from the river. There was a sailboat there and there were some people—I believe it was one black man and one black woman fishing.

Q: At the new marina?

A: Yes, sir.

Q: All right. Then after you observed that, what next happened?

A: The next thing that stands out to me that I have been able to recall, been able to recollect, was I went around to the far side of the New Marina, which it consists of a dirt, a narrow, dirt road, and there I saw this red car. Now, as to the make of the car, I have no idea.

Q: All right.

A: But there were two ladies coming up the—There is a steep incline there going down to the water. And I observed two ladies coming up that incline.

Q: Now, when you say coming up, would that have been from the water to their car, is that what you're ...

A: That's correct.

Q: ... telling us?

A: Yes, sir, that's what I'm trying to say.

Q: All right. And what occurred?

A: I pulled my car up beside of their's.

Q: So you were still driving when you saw them coming up?

A: Yes, sir, I was.

Q: All right.

A: And I got out of the car, my car, and pulled my gun on them.

Q: Now, you say you pulled your gun.

A: Yes, sir.

Q: Where had your gun been?

A: My gun was in my hip pocket, my right hip pocket.

Q: Was it there while you were driving?

A: Yes, it was.

Q: Did you have handcuffs?

A: Yes, sir, I think so.

Q: Where were they?

A: Probably in my pocket.

Q: Would that be the normal place for them to be?

A: No, sir, generally they were on the signal light reflector knob is where they generally were.

Q: Hanging, dangling?

A: Yes, sir.

Q: All right. You say—Now, you've already said that you pulled your gun on the ladies. Now, ...

A: Yes, sir.

Q: ... at that time, were you in your car or out of the car?

A: I was out of their car, out of my car and at the rear of their car.

Q: Where was your gun at that time?

A: In my hand.

Q: And where were the handcuffs at that time?

A: At that time, I guess the cuffs were in my pocket.

Q: All right. And what, if anything, was said when you got there and that happened? After that happened, what, if anything, was said?

A: I just—I told them that they were going to go with me. And I marched them across some, something like a hundred yards, to a wooded area where it's real brushy. And I guess my intentions was sex; I don't know. But anyway, Mrs. Culpepper, I believe her name was, put the cuffs on her wrist and Miss Paseur's wrist.

Q: Did you tell her to do that?

A: Yes, I believe I did.

Q: Were they fastened tight or loose?

A: No, sir, they were very loosely.

Q: Then what occurred?

A: I had—I made Mrs. Culpepper undress from the waist down, and I attempted to have oral sex with her.

Q: At that particular time, were they standing, sitting or lying down?

A: Lying down.

Q: Were they lying on their stomach or their back?

A: On their back.

Q: Were they side by side or in some other position?

A: Side by side, yes, sir.

Q: At any time during that time when you, as you stated you attempted to have oral sex, did you ever unzip your trousers?

A: No, sir, I did not.

Q: Did you ever take your trousers down?

A: No, sir.

Q: You did not undress at all?

A: No, sir.

Q: Now, when you say you attempted to have oral sex, it's necessary to, for this jury to understand exactly what you mean. Now, when you say that, do you, are you telling the jury that it was your mouth?

A: That's correct.

Q: Are you saying that it was her private, female part ...

A: That's correct.

Q: ... that was involved?

A: That's correct.

Q: And nothing else?

A: That's all.

Q: Now, how long did this attempt at oral sex last?

A: Not over three or four minutes.

Q: And during that time, what was Miss Paseur, the younger of the two ladies doing?

A: Well, she was laying side of Mrs. Culpepper, but she was very hysterical and she was screaming at Mrs. Culpepper.

Q: Screaming?

A: Yes, sir.

Q: All during that time?

A: Yes, sir.

Q: Do you remember the words she said?

A: The only thing that stands out, is she accused Mrs. Culpepper of enjoying what I was doing to her.

Q: Is that a fact?

A: Yes, sir.

Q: Anyway, what next occurred?

A: Then after it was over with, they both got up and attempted to dress, Mrs. Culpepper did, as she had on, I believe it was a pair of shorts. I can't be sure, but I think that's what it was. And as she pulled her shorts up and got them buckled, or got them zipped, or however she fastened them, after she did this, her and Miss Paseur both at the same time made a lunge, and I don't know, I just—I had the gun on them and I pulled the trigger. And I believe that I struck Mrs. Culpepper, and then as she fell back, I shot Miss Paseur.

Q: Well, what length of time was there between the first shot and the second shot?

A: It was very close together.

Q: Did you fire two shots only?

A: Yes, sir.

Q: Not three?

A: No, sir.

Q: At the time that you fired the first shot, had Mrs. Culpepper gotten her clothes back on or not?

A: Yes, sir.

Q: And then what did you do?

A: I then left them both in the, on the ground and went back to my car.

Q: You did what?

A: I left them there and went back to my car.

Q: Did you do anything, one way or the other, with respect to the clothing of Miss Paseur?

A: Yes, I did, I ripped them.

Q: Did you do anything else?

A: No sir.

Q: Did you then go back to your car?

A: Yes, sir, I returned to my car and I passed by their car, or her car, whichever one it belonged to, and I take her pocketbook off the front seat of the car.

Q: And then what did you do?

A: I immediately left the island.

Q: And where did you head?

A: Home.

Q: To Waycross?

A: Yes, sir.

Q: And what happened on the way to Waycross?

A: I threw the pocketbook out somewhere around the Satilla River Bridge.

Q: Now, describe how you went at that. Did you throw it out over the passenger's seat, or on the same side you were, out of the window on your side?

A: I pulled over to the wrong side of the road from which I should have been traveling and tossed it out the window.

Q: The window you tossed it out of, was it the driver's side window?

A: That's correct, yes, sir.

Q: And did it go over the bannister of the bridge there?

A: Yes, sir, I think so.

Q: And then what did you do?

A: I proceeded on towards Nahunta, which just a few seconds, just a few minutes after this, I was stopped by a Brantley County Deputy Sheriff.

Q: You heard him testify. Was that the same man who stopped you?

A: Yes, sir, it was.

Q: Mr. Rowell?

A: Yes, sir.

Q: Meanwhile, had you looked in the pocketbook to see whether there was money in it or not?

A: Mr. Davis, I don't know whether I did or not.

Q: You do not know?

A: I do not know.

Q: Now, you've heard the testimony about what happened following that, and has that testimony been in accordance with your memory of the things that happened after that?

A: Yes, it has.

Q: And your memory doesn't tell you any different from what has been testified about, all of these things that happened following that?

A: No, sir, the best that I can remember, I would go in accordance with them.

Q: You what?

A: I would go in accordance with them.

Q: I didn't understand.

A: They would be in accordance.

Q: In accordance. All right.

Mr. Davis: You may examine the witness.

Respondent's Exh. 1G at 1147–61.

The majority seeks to portray Davis' decision to put Waters on the stand as a reasonable strategic decision calculated to help "humanize" Waters in the eyes of the jury. This portrayal is erroneous for two reasons. First, Waters' testimony did anything but "humanize" him in the eyes of the jury. Waters' description of the killings is chilling. At Davis' prompting, Waters described not only the grisly details of his crimes, but also the victims' reactions. Waters' testimony, as orchestrated by Davis, paints the picture of a man who killed without emotion.

Second, evidence offered at the state habeas hearing indicates that Davis did not prepare Waters to testify. Manning testified that the decision to put Waters on the stand was made "in the courtroom itself or possibly with Mr. Waters in the holding cell adjacent to the courtroom." Respondent's Exh. 3B at 86. Davis testified:

Q: The Defendant's testimony was intended to accomplish what? Do you remember?

A: It was intended to allow the Jury to form a clear idea of what Kelly Waters was like as a person.

Q: Do you remember a moment in Mr. Waters' testimony and he's discussing the facts of the crime and he recounts the statement made by the younger of the two victims?

A: Yes, I remember that.

Q: Do you remember that that statement had to do with the older victim enjoying the sex act that Mr. Waters was committing at the time

A: Yes, I remember that.

Q: Do you recall the effect of that testimony on the courtroom?

A: Well, of course, that would involve a little speculation *but it stands to reason that it was highly adverse effect.*

Q: As a matter of fact, do you recall a couple leaving the courtroom, sobbing?

A: No, I don't recall that.

Q: Was that a piece of testimony that you felt you wanted the jury to have?

A: No, it was not.

Q: *Was that piece of testimony discussed with Mr. Waters before the trial?*

A: *It was not.*

.     .     .     .     .

Q: *Did you tell [Waters] before the trial that you were going to ask him, for example, the question that drew the response that we discussed earlier?*

A: *No,* I don't—as a matter of fact I don't recall asking him a question that drew that particular response. The testimony was given by him but I do not recall its having been in response to a specific question by me.

Respondent's Exh. 3B at 60–61 (emphasis added). Contrary to Davis' recollection, Waters' damning testimony was in response to very pointed and specific questions by Davis. Again, Davis either intentionally sabotaged his client's case, or he had no idea what his client would say on the stand.

A fourth and final example of Davis' violation of the fundamental rules of trial practice is his closing argument at the conclusion of the sentencing phase. With this closing argument, Davis violated the last two rules listed in part III.A. above: he disparaged and diminished Waters before the jury, and, rather than identifying with Waters and helping the jury identify with him, he distanced himself from Waters. At the beginning of the closing argument, Davis said: "It strikes me that Kelly Waters is a miserable wreck of a human being...." Respondent's Exh. 1H at 1344. Davis then concluded the closing argument by referring to Waters as "a nut" and "a living subject that can be studied," and he asked the jury to make "a study" of Waters rather than killing him:

... Can any good come out of this case? I'll say it can. I'll say the good that can come out of it would be this. We know what happens to a case similar to Kelly Waters when he refrains from taking drugs. We've found out to our sorrow, to the utter shame of the County, to that event which brought so much sadness to the wife, to the families of the victims in this case, to that occasion which brought so much sadness to the family of the Defendant in this case. We found out what would happen. I say if he is allowed to serve a life, a sentence of life imprisonment, he is a living subject that can be studied, that upon whom the effects of drugs can be determine with more certainty than it can be now. He is a prime case of what can happen if he doesn't take drugs and what steps may be needed by society to ensure that a man in his boots needs to take drugs and needs to be put under such circumstances as you either know he's on drugs or else he's in a condition where, where nothing, no harm can come from him if he refrains from taking them. You going to make him responsible for taking them? Well, he's a nut to start with. It happens every day in our lives. You cannot depend on that. But in his case, you can. In his case, he's an ideal subject for the medical profession to say, all right, here is a man, called to God one day, called to a pistol and handcuffs the next day. He's got that kind of split personality. He doesn't know whether to serve the Lord or serve the Devil. He doesn't even know whether he wants to be a person or not. We'll take him. We'll experiment with him. We'll find out more about what can, the limits of activity in his case. We'll use him for the good of society, so that an offense of this nature will not be repeated. That's the human thing to do in this case. It's a socially advisable thing to do. *I agree this sort of thing excites the basest emotions I suppose that can be excited in the human breast; revenge, lack of mercy, all of those kinds of emotions are excited in the mind of any normal person that heard this evidence.* Of course, it is. But what is the socially acceptable, merciful, biblical, Christian

thing to do here? I say don't kill him. Don't rub him out. Don't put him out of existence. Keep him. Study him. Learn about him. Keep him so he can't do anybody else any harm. Maybe from the result of his continued life, the results ... of continued examination of him and a study of him will make it possible that the lives of more innocent people will not be sacrificed. I ask you to consider that. And I ask you in reaching your verdict to let this man continue to live in the interest of serving, doing your duty as an enlightened citizen facing up to the tremendous responsibility that the law vest upon you in this case.

*Id.* at 1353–33 (emphasis added). Thus, Davis concluded the case for his client—not with a plea for mercy for a human being, but with a dehumanizing request to allow a specimen to be studied.

Not surprisingly, the majority spends much time in its attempt to justify Davis' closing argument. In so doing, the majority endorses a cynical and utterly depressing view of mankind, and of jurors in particular. The majority concludes that Davis' closing argument was reasonable notwithstanding that it runs counter to basic moral sensibilities; as the majority says: "counsel's strategic decision was within the wide range of reasonableness—reasonableness to the task at hand, not reasonableness as a matter of moral values or philosophy." Majority Opinion at 1522. The majority suggests that jurors are more likely to be motivated by an appeal to base human emotions—such as a desire to turn a human being into a laboratory specimen—than by an appeal for mercy. I cannot concur in such a degrading view of my fellow man.

## IV. CONCLUSION

Where a defendant has confessed to murder and the State seeks the death penalty, defense counsel's only purpose is to seek a life sentence. Obviously, that is no light assignment. Success turns on whether counsel can portray his client as a human being. If jurors conclude that the defendant is practically a violent animal, a vote for the death penalty is not unexpected. In this 20th Century of advanced civilization, we have witnessed the horrors of an Adolph Hitler (with his millions of followers) and the peaceful overthrow of the British yoke by a nonviolent Ghandi.

Effective defense attorneys know the ambivalence with which jurors' feelings can be influenced by words, behavior, and nuances in the courtroom. Waters had as his appointed defender a lawyer who either did not understand this drama or who himself thought Waters was not a human being and deserved to die. *I do not attribute to Davis this latter callousness.* I think Davis' age, years in Congress, and retirement had so far removed him from the fray of the courtroom, that he was incapable of rising to the considerable challenge presented by his assignment to defend Waters. Constitutionally, Davis' defense of Waters was neither effective nor purposeful, despite anything the majority says to the contrary. Life is dear and holy. Humanness is a sacred state. I believe a defendant whose life is in the balance deserves legal representation that is effective, purposeful, and to which we can point with confidence when we affirm a death penalty. That scenario does not exist here.

Davis' ineffectiveness as Waters' defense attorney cries out from every page in the transcript as well as from the testimony of Davis and Manning at the habeas hearing. By his own admission, Davis was aware that the only issue for the jury was whether Waters lived or died. Yet he had no strategy for the sentencing phase of the trial; his presentation of evidence was directed toward whether Waters was insane at the time of the killings, when he did not have a shred of evidence that would show Waters did not know the difference between right and wrong; his elicitation of evidence from witnesses he called in Waters' behalf sealed Waters' fate; he failed completely to exploit the promise of *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), that defendants found guilty of murder may nevertheless escape the harsh penalty of death by establishing mitigating evidence that explains the behavior of the defendant leading to the murder.

The trial record is *entirely devoid of Davis' presentation or discussion of mitigating evidence* and the remedy established by *Lockett*. The instructions of the trial court contained one sentence advising the jury about mitigating evidence: "Members of the Jury, you should, you should consider all evidence submitted in the trial of this case in arriving at your verdict as to the sentences imposed. *This would include any evidence of mitigating circumstances received by you in this case.*" Respondent's Exh. 1H at 1362 (emphasis added).

There was ample available evidence of Waters' schizophrenia, its delusional and hallucinatory components, the effect of the disease on a person's ability to control his or her behavior, and how it specifically affected Waters. Whether such evidence, the exclusion of the inflammatory evidence placed in evidence by Davis against his own client, and the education of the jury about *Lockett* would have resulted in a sentence for life verdict, we shall never know. The case was a difficult one. But that was no reason for Davis to surrender before trial commenced and tell the jury in closing that his client "was a nut." The Sixth Amendment and the promise of *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), was not fulfilled in Waters' trial. Davis was ineffective. The district court's denial of Waters' petition for the writ was error and should be reversed.